RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-5891

LUIS LOPEZ-MEDINA,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 04-00086—Robert L. Echols, Chief District Judge.

Argued: June 8, 2006

Decided and Filed: August 25, 2006

Before: MOORE, COLE, and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Alfred S. Donau III, DONAU & BOLT, Tucson, Arizona, for Appellant. Vijay Shanker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Alfred S. Donau III, DONAU & BOLT, Tucson, Arizona, for Appellant. Vijay Shanker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Sunny A. Koshy, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

## OPINION

---

R. GUY COLE, JR., Circuit Judge. Defendant-Appellant Luis Lopez-Medina ("Medina") appeals his jury conviction for conspiracy to distribute five kilograms or more of cocaine, as well as his sentence of 292 months of imprisonment and five years of supervised release, based upon the district court's finding that he conspired to distribute 147 kilograms of cocaine. Medina presents the following issues on appeal: 1) a claim of ineffective assistance of counsel in connection with his trial; 2) a challenge to the district court's denial of his pretrial motion to suppress evidence obtained during a search of Medina's house; 3) several claims that the district court committed reversible error in admitting certain evidence; 4) an appeal of the district court's denial of his motion for judgment of acquittal; 5) a claim of prosecutorial misconduct; and 6) several challenges to his sentence under *United States v. Booker*, 543 U.S. 220 (2005).

1

For the reasons set forth below, we AFFIRM the district court's denial of Medina's motion for a judgment of acquittal, VACATE Medina's conviction and sentence, and REMAND for further proceedings.

## I. Background

Medina is a citizen of Mexico who was living in Nashville, Tennessee in 2003. Medina's residence was under surveillance by the United States Drug Enforcement Administration (DEA) in August 2003. Two surveillance cameras were positioned in concealed locations on the residence next door to Medina's (the "surveillance residence"). On August 7, 2003, Billy Joe Mundy, a Special Officer with the DEA, was reviewing surveillance tapes within the surveillance residence. The tapes revealed the following activity: Medina changed the license plates on one of the vehicles in his driveway; a red truck arrived, picked up Medina, and returned a short time later; the red truck returned two hours later and Medina assisted an unknown male in transporting suitcases from the truck to Medina's residence; the unknown male emerged from the house ten minutes later with a suitcase and departed; and Medina emerged from his residence and briefly rode around the neighborhood on a bicycle, which Mundy opined at trial was likely an act of "counter-surveillance."

Later that day, Mundy observed that Medina appeared to notice and directly approach each of the concealed cameras on the surveillance residence. Mundy called for assistance, reporting that he believed surveillance had been compromised. David Lance Hampton, a DEA Task Force Officer, arrived and reviewed the videotapes. Approximately three hours after Medina's apparent discovery of the surveillance cameras, a silver car pulled into Medina's driveway. Mundy and Hampton testified that a black male, later identified as Gary Jackson, exited the vehicle with a large duffle bag and entered the residence. Less than one minute later, Jackson re-emerged from the residence carrying the same duffle bag, which appeared to be heavier than when he arrived, and immediately drove away. Mundy alerted other members of the Task Force regarding Jackson's arrival and departure with the duffle bag, and requested that they stop his vehicle. Task Force members engaged in a vehicular pursuit of Jackson, who fled at a high rate of speed and at one point hit another vehicle. The agents were not successful in apprehending him.

Less than a minute after Jackson's departure, Medina emerged from his residence and rode around the neighborhood on his bicycle once again. Mundy and Hampton emerged from the surveillance residence and approached Medina on the street. Their weapons were concealed. Mundy identified himself and instructed Medina to dismount from his bicycle. Medina complied and inquired into the reasons for the request, and, according to Mundy's testimony, Mundy responded, "You need to come with me, and we'll talk about it." Joint Appendix ("JA") 351. Hampton put his hand on Medina's arm and the agents escorted Medina into the surveillance residence. The officers patted down Medina as soon as they entered the house, and Hampton testified that either he or Mundy likely had a hold of Medina's arms as they walked him up the stairs of the residence. The residence was vacant and contained no furnishings other than a table and chairs.

After Medina confirmed that he understood English, Mundy read Medina his *Miranda* rights in English from DEA Form 13A. Medina then stated he did not understand, at which point Mundy read him his rights in Spanish from the same form. Medina stated that he understood the rights as read to him in Spanish. Mundy asked Medina whether he was a United States citizen or had a green card and Medina responded in the negative to both questions.

Mundy left Medina inside with Hampton and met outside with Harry Sommers, a DEA supervising agent. Mundy and Sommers discussed a plan for speaking to Medina and then returned upstairs. Upon their return, Hampton went outside to obtain consent-to-search forms in both English and Spanish. Mundy testified that he and Sommers asked Medina in Spanish whether there were

any drugs in the house, to which Medina responded "no." They also asked whether he would object to a search of his house, to which he again responded "no."

Hampton returned with the consent forms and again departed. According to Mundy's testimony, Mundy asked Medina to read the first line of the English form, and upon concluding that Medina could read English, Mundy instructed Medina to sign the form if he agreed to a search of the residence by the DEA agents. Medina signed the form. Mundy then presented Medina with the Spanish version of the form and explained that it was the same form he had just signed in English. Mundy asked Medina to read the remainder of the form to himself, which Medina appeared to do, and Medina then signed the Spanish form.

After Mundy, Sommers, and Medina emerged from the surveillance residence with the executed consent forms, Hampton handcuffed Medina and led him to his residence. Medina's wife answered the door, and the agents introduced themselves and explained that Medina had consented to the agents' search of the house. The agents asked Medina and his wife to wait in the van in their driveway while the agents searched their house. Later, the agents brought Medina and his family back into their residence, and they watched as the agents searched the living room. Both Mundy and Hampton testified that Medina had ample opportunity to revoke his consent to the search but never indicated a desire to do so. Mundy and Hampton described Medina's demeanor as "arrogant" and "cocky" throughout the search.

The search of Medina's residence uncovered used and unused plastic heat-seal baggies, plastic wrappings covered in duct tape and marked with numbers, two heat sealers, a large digital scale, an unidentified white powder, scraps of paper with Spanish words and lists of numerals written on them, seven cell phones, a blue duffle bag which smelled of ether and contained $48,196 in United States currency bundled with colored rubber bands, and a shoebox containing $2,820 in United States currency and colored rubber bands matching those found on the other bundled currency. Another $2,900 was seized from Medina's person.

After reminding Medina of his *Miranda* rights, the agents interviewed Medina inside his house regarding items that were found during the search. Medina attempted to explain every item identified by Mundy, and Mundy repeatedly accused him of lying. Medina eventually requested an attorney, and the interview was terminated. Subsequent to the search, Medina was taken into custody by the U.S. Department of Homeland Security.

Medina was indicted by a federal grand jury on one count of conspiring to distribute and possess with intent to distribute five kilograms or more of a mixture containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. §2. The indictment also included a drug trafficking forfeiture charge pursuant to 21 U.S.C. § 853.

Medina filed a pretrial motion to suppress the evidence obtained from the search of his residence and all statements obtained from Medina "related to the search and matters discovered during the search," JA 16, arguing that his consent to the search was not voluntary because of his unfamiliarity with the English language, United States law enforcement procedures, and his rights under the United States Constitution. The district court held a suppression hearing at which Mundy, Hampton, and Medina testified. The district court denied Medina's suppression motion, finding that Medina was not credible in his claimed lack of understanding English, and finding that the Government had met its burden of proving that Medina's consent was voluntary.

Medina was tried by a jury on November 16–19, 2003. The owner of Medina's residence confirmed that Medina had lived at the address surveilled and searched by the DEA. The Government then called Mundy to testify.

Mundy began his testimony by recounting his experience and training in investigating narcotics trafficking, including extensive training in the Spanish language, and described some of the common drug trafficking practices he had seen. These practices included "piggybacking" loads of cocaine, that is, including cocaine from other drug traffickers along with a particular trafficker's shipment if that trafficker has room to spare; packaging kilograms of cocaine with distinctive markings to distinguish loads from different traffickers that had been "piggybacked;" packaging cocaine in brick shapes using duct tape; wrapping cocaine in colored plastic wrap; increasing the quantity of cocaine for sale by mixing the cocaine with "cutting" agents; smuggling cocaine in grease or other odorous substances to avoid canine detection; bundling money used as drug payment using rubber bands; "fronting" cocaine to street-level traffickers on a trust or credit system before receipt of full payment; documenting one's expenses and the movement of drug shipments using informal scraps of paper such as bar napkins, matchbook covers, or children's notebooks; and packaging cash for payment using heat-sealers.

Mundy then testified concerning the activity he had witnessed at Medina's residence on August 7, 2003, and the items he had recovered from Medina's home. The prosecution introduced into evidence photo stills of the surveillance video, depicting the activity observed by Mundy before he approached Medina. The physical evidence recovered from the search of Medina's residence was introduced into evidence, and Mundy provided detailed descriptions of several of the items, including where they were found and his opinion as to their significance. For instance, Mundy explained that several small, empty, square-shaped duct-tape-wrapped baggies, each containing a heat-sealed plastic bag inside, which were found in Medina's garage, basement bathroom, and in the trash outside of Medina's residence, were consistent with packages used throughout the country to wrap and ship kilograms of cocaine. Mundy reiterated that often such packages would be marked to denote the owner of the cocaine. At the prosecutor's instruction, Mundy pulled apart the plastic and duct tape in the exhibits, revealing markings on the inside of the bags, such as "1-0-10." The evidence also included numerous grease-covered square plastic wrappings with numbers, such as "100," "30," "10," and "46," written on the outside of them. Mundy testified that nineteen such wrappings were found soaking wet and stuffed in a bag near the commode in Medina's basement. Throughout his testimony, Mundy repeatedly referred to these plastic wrappings as "kilogram wrappers." Mundy also testified that heat-sealers such as those found in Medina's residence were often used to repackage cocaine or to package money. Mundy testified that the wrappings recovered in Medina's home included some heat-sealed wrappers that had been used—sealed at both ends but cut open in the middle—as well as some unused wrappers. Mundy testified that ether, which he smelled upon opening the duffle bag in Medina's basement containing $48,196, is commonly used in the production of both cocaine base and methamphetamine. Mundy acknowledged that the white powder found in Medina's basement, as well as all of the other items found, tested negative for cocaine.

Mundy also testified regarding his interpretation of a notebook found on a table in Medina's basement that Mundy believed was a "drug ledger." Mundy testified that the scraps of paper found in the notebook were similar to scraps of paper which he had seen in past investigations and which often documented incoming and outgoing amounts of cocaine and money. One page introduced into evidence included Spanish phrases that Mundy translated as "they have given me" and "received," words in English such as "1 Round" and "2 Round," and several numerals. JA 222. Another page included Spanish phrases such as "Primera transportacion" (first shipment), "Recivido 73 Cajas" (received 73 boxes), "Caja # 2" (box # 2), and other numerals, some of which correspond to numerals on the first page. JA 224. Mundy testified that he believed "38 x 18.5 = 703," found on the scrap of paper, JA 224, referred to 38 kilograms of cocaine times $18,500 per kilogram, for a total of $703,000 in cocaine sales, and that the "35 x 18 = 630," found immediately beneath it, referred to 35 kilograms times $18,000 per kilogram, for a total of $630,000 in cocaine sales. Added together, the two amounts would equal 73 kilograms of cocaine sold for $1,333,000. Mundy testified that the wholesale price of cocaine in Nashville ranged from $16,000 to $19,000 per

kilogram, and that the $18,000 and $18,500 per kilogram listed on the "drug ledgers," as he interpreted them, were consistent with a typical wholesale value for 35 to 38 kilograms of cocaine. Medina's counsel objected to Mundy's speculative testimony, and the court overruled the objection.

Mundy gave testimony regarding other documents found in Medina's home, including mail, bank documents, and other official paperwork, that bore several different names. These documents included a Mexican passport with Medina's photograph in the name of Daniel Torres Garcia, an identification card also bearing Medina's photograph accompanying an airline receipt in the name of Daniel Torres Garcia, a marriage certificate in the name of Francisco Antonio Garcia Medina, and utilities bills and bank account documents addressed to Luis Medina Lopez at the Nashville address. The Government used these documents to argue that the defendant had created a false identity, in the name of Luis Medina Lopez, to conduct a narcotics trafficking operation in the United States.

Mundy testified about his conversation with Medina during the search, and indicated that Medina responded to many of his questions with obvious lies. According to Mundy, Medina told him that the packages which Mundy suspected were kilogram wrappers had been used as wrappings on new furniture he had purchased. When Mundy replied that he believed Medina was lying because no furniture could fit in bags that small, Medina allegedly responded, "The plastic bags you found in the bathroom that were wet, my shower had overflooded. That's the reason they're there." JA 503. Mundy stated that he then inspected the shower but found it was completely dry. Mundy testified that Medina first denied a black male had been to his house, but then finally admitted that a black male whom he claimed he did not know had entered his house to look at the Chevrolet Avalanche in the garage, which Medina claimed was for sale. Medina stated that the individual had brought a shoebox, and denied that he had brought a duffle bag. Medina claimed the individual had paid him $45,000 in cash for the Avalanche, which Medina had then placed in the bag. The estimated resale value of a vehicle of that make, model and year, however, was shown at trial to approximate $27,700. Furthermore, Mundy testified that an inspection of the vehicle showed that it had parts missing and was in poor condition. Other witnesses with experience appraising vehicles testified that the condition of the vehicle was not consistent with the value that Medina attributed to it. Medina also denied discovering the surveillance cameras, instead offering the explanation that he had seen a garden snake on the roof and pursued it, which Mundy also found implausible. Mundy testified that the agents found a pair of binoculars in Medina's bedroom next to a window that overlooked the surveillance residence.

The Government offered the testimony of Shane Daugherty, a trained canine handler for the DEA Task Force, who described the canine search performed at Medina's residence. The dog immediately led Daugherty to Medina's basement closet and began scratching at the duffle bag containing large amounts of currency. Daugherty testified that this scratching was deemed a "final response" and signaled that the dog had located the source of a narcotics odor. The dog also displayed behavior changes suggesting that it had detected narcotics near a shelf in the garage where a set of scales was later found, and near the speaker box in Medina's vehicle. The dog did not give a "final response" around these items. Testimony also established that the dog was trained on numerous drugs, including methamphetamines and marijuana, and not just cocaine.

Ron Riddle, a DEA agent assigned to a criminal case involving Gary Jackson, corroborated Mundy's opinion testimony. Riddle testified that the numbers on the packages found in Medina's residence likely signified the different individuals who were to receive money for cocaine. Riddle also testified that in his opinion the scraps of paper found in Medina's basement were drug ledgers. He corroborated Mundy's estimation regarding the street price of cocaine. Riddle also opined that the numbers "38 x 18.5 = 703" and "35 x 18 = 630" designated 38 kilograms and 35 kilograms of cocaine, multiplied by the respective unit prices of $18,500 and $18,000 per kilogram, equaling two subtotals of $703,000 and $600,000, for a total of $1,333,000 worth of cocaine sales. Riddle noted that the same "1,333,000" figure appears on another "ledger," which Riddle again interpreted to

refer to $1,333,000 in cocaine sales. Riddle speculated that other numbers appearing on the scraps of paper referred to Medina's $23,200 in expenses, labeled as "Costas," and that still other numbers referred to $1,215,000 in payments that had already been made and another $95,000 in outstanding payments that were still due. The testimony of Duane Cottrell, an agent with the Department of Homeland Security, corroborated Mundy's and Riddle's testimony interpreting the words found on the scraps of paper. Medina's counsel again raised an objection to the testimony interpreting the documents, which the court overruled.

Terry Strayn, a prosecution witness who was a prisoner at the same facility as Medina and who had agreed to testify in exchange for possible leniency in his own pending criminal matters, testified that Medina "said that he was dealing cocaine," JA 753, and that although he had only been indicted for five kilograms he had actually been dealing about 150 kilograms.

The Government also introduced evidence linking Medina with individuals who had prior cocaine felony convictions. Mundy testified that the individual seen leaving Medina's residence in a silver car was Gary Jackson, and when Medina's counsel objected to the use of Jackson's name without a proper foundation, the prosecution introduced as an exhibit a mug shot of Jackson. Riddle testified regarding his ongoing investigation into Jackson for drug trafficking. Medina's counsel objected, apparently on the ground of lack of foundation, which led the district court to suggest that the prosecution seek to admit into evidence Jackson's past conviction. The prosecution did so, and the evidence was admitted. Ricky Lee Stewart, a DEA agent working with the Nashville police and the officer who pursued the silver car that left Medina's home, testified that he clearly saw the face of the driver and that it matched the mug shot of Gary Jackson.

The prosecution also successfully sought the admission of testimony regarding the past cocaine conspiracy conviction of a brother of Medina's acquaintance. Specifically, Jesús Medrano testified that he once met Medina through a man named José Vincente Corona. The evidence showed that José's brother, Robert Corona, had been convicted of conspiracy to possess with intent to distribute cocaine. The evidence included Robert Corona's photograph and prior drug conviction.

At the close of the Government's case, the defense immediately rested its case and moved for a judgment of acquittal. The motion was denied.

The jury returned a verdict of guilty on the count of conspiracy to distribute or possess with intent to distribute five kilograms or more of a substance containing a detectable amount of cocaine. The jury then heard argument and instruction on the forfeiture charge, and returned a special verdict that Medina's property was subject to forfeiture.

Medina's conviction carried a statutory sentencing range of ten years to life. 21 U.S.C. § 841(b)(1)(A). A Presentence Investigation Report ("PSR") was prepared in which Medina's sentencing range under the United States Sentencing Guidelines was calculated as 292 to 365 months. This calculation was based upon a factual finding that Medina had conspired to distribute at least 147 kilograms of cocaine, a two-level enhancement for obstruction of justice due to Medina's alleged false testimony about his name and employment history during his suppression hearing, and a criminal history calculation that included a charge for re-entry as a previously deported alien, which arose from Medina's August 7, 2003 arrest. The PSR recommended a sentence of 292 months of imprisonment and five years of supervised release. Medina submitted objections to the recommended sentencing range, arguing that the factual findings about drug quantity and his alleged perjury violated his Sixth Amendment rights under *Booker,* and that his criminal history calculation should not have included his recent immigration charge because it arose at the same time as his instant charge and was part of a single common scheme or plan. The district court overruled Medina's objections and calculated Medina's Guideline range in the manner recommended by the PSR. The district court sentenced Medina to 292 months of imprisonment and

five years of supervised release, in keeping with the PSR's recommendation, acknowledging that the Guidelines range was advisory.

Medina filed a *pro se* appeal of his conviction and sentence on March 30, 2005. Medina is now represented by new counsel.

## II. Ineffective assistance of counsel

Medina argues that the performance of his trial counsel fell short of the assistance of counsel guaranteed by the Constitution. To demonstrate ineffective assistance of counsel egregious enough to warrant reversal of a conviction, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Performance of counsel is constitutionally deficient if the conduct "fell below an objective standard of reasonableness." *Id.* at 688. There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Medina cites numerous examples of conduct which he contends demonstrates the deficiency of his counsel's performance. These include counsel's failure to make any motions other than a motion to suppress, failure to allege in the suppression motion the unlawfulness of Medina's seizure, failure to object to certain evidence and testimony, including the expert testimony of DEA agents when their expertise had not been established, unskilled cross-examination that elicited further incriminating evidence, and references to counsel's own illness during the trial.

Ineffective assistance claims are more properly raised in a post-conviction proceeding brought pursuant to 28 U.S.C. § 2255, where the record regarding counsel's performance can be developed in more detail. *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999). This Court typically will not review a claim of ineffective assistance on direct appeal except in rare cases where the error is apparent from the existing record. *See United States v. Gardner*, 417 F.3d 541, 545 (6th Cir. 2005). Here, the alleged ineffectiveness of Medina's trial counsel is not apparent from the record. The record contains no evidence regarding why, for example, defense counsel chose not to file any additional motions beyond his initial motion to suppress or why he chose not to challenge the agents as experts on matters pertaining to narcotics trade. Absent evidence specifically addressing counsel's performance, we cannot determine whether his actions reflected a reasoned trial strategy. We therefore conclude that Medina's ineffective assistance claim is not ripe for review.

## III. Motion to Suppress

### A. Medina's understanding of the consent form

Medina appeals the district court's denial of his suppression motion based upon his argument that he did not understand the consent forms he signed. Whether consent is voluntary is a question of fact determined from the totality of the circumstances. *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988). We review the district court's findings for clear error, and cannot reverse absent a "definite and firm conviction that a mistake has been committed." *United States v. Moncivais*, 401 F.3d 751, 754 (6th Cir. 2005) (quoting *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999)). The district court's credibility findings are entitled to particular deference, because the district court is in a better position than we to observe a witness's demeanor. *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

Although Medina was given both an English version and Spanish version of the consent form, Medina testified that he could not understand much of the English form and that the Spanish form contained a translation error that rendered his consent unknowing and involuntary.

Specifically, Medina points to the first paragraph of the Spanish form, which Mundy had asked Medina to read aloud before signing. According to the court interpreter, the verbatim translation of the first paragraph of the Spanish form is: "Number one. I have been consulted to permit the agents from the Department of Narcotics and Drugs to search." JA 377.[1] Medina testified that the first paragraph says that the agents were "asking [him] if [he] was in agreement." JA 412. He then testified that his understanding of the first paragraph was that the agents were "telling" him that they were going to look for drugs, and that "consult means they were trying to tell me." JA 412–13. The Government further pressed Medina about his understanding of the first paragraph, asking, "Consultar means ask, right?" JA 413. Medina responded, "For a lot of people, no. Consultada means I am going to ask you questions. Or I am going to interrogate you, ask you questions." *Id.*

Regardless of whether the first paragraph of the Spanish form properly conveyed that the agents were seeking Medina's consent, the remainder of the form made the intent clear. The third paragraph translates as "I freely consent to this search."[2] JA 377. Although Medina testified that he did not read the third paragraph of the form before he signed it because he was nervous, there is no dispute that he was provided the entire form to review and given sufficient opportunity to read as much as he wanted before signing.

Furthermore, the district court found that Medina was not credible in his assertions that he did not understand English, and the record does not reflect that the district court committed clear error in this assessment. The district court observed that Medina's "demeanor and reaction to questions on the stand" demonstrated his understanding of English. JA 41. Mundy testified that Medina appeared to have no difficulty understanding him during their conversations in English, that his answers to questions were responsive, and that Medina conversed with him in English until asked whether he understood his *Miranda* rights. Papers in both English and Spanish were found in Medina's home. Mundy testified that when he asked Medina to read the first line of the English consent form, "it became apparent . . . that [Medina] could read the English language." JA 367. Given that Medina understood and executed an English version of the consent form, any error in translation in the Spanish form is immaterial.

Because the district court did not commit clear error in finding that Medina voluntarily consented to the search of his residence, we AFFIRM the district court's denial of his suppression motion.

## B. Taint of illegal seizure

Medina also argues, for the first time on appeal, that his consent to the search was obtained only after he had been arrested without probable cause in violation of the Fourth Amendment, and that therefore his consent was tainted by his unlawful seizure and hence invalid. Under Fed. R. Crim. P. 12(e), a party "waives" any pretrial defense or objection that he or she did not raise before the trial court's pretrial motion deadline. The rule permits the court to grant relief from the waiver only for "good cause." Even when a party has brought a pretrial suppression motion, as Medina did here, any new suppression arguments raised for the first time on appeal that were not contained in the original suppression motion will be deemed waived under Rule 12(e). *See United States v. Critton*, 43 F.3d 1089, 1093 (6th Cir. 1995).

Medina argues that he has shown "good cause" for his waiver because his trial counsel was ineffective. As we have noted, this Court generally does not consider ineffective assistance of

---

[1] The paragraph reads in Spanish: "Me sido consultado para permitir a los agentes del departamento de drogas y narcoticos el registrar." JA 31.

[2] The paragraph reads in Spanish: "Yo libremente conseinto a este registro." JA 31.

counsel claims raised on direct appeal because the record is usually insufficient to permit adequate review of such a claim. *See Gardner*, 417 F.3d at 545. Medina has not cited any authority creating an exception to this general rule for ineffective assistance of counsel arguments raised for the purpose of showing "good cause" under Fed. R. Crim. P. 12(e). As discussed in Part II above, we conclude that Medina's ineffective assistance claim is not ripe for review, and Medina therefore cannot, at this point, demonstrate "good cause" to excuse his waiver under Rule 12(e). We therefore conclude that Medina's argument that he was unlawfully seized has been waived within the meaning of Rule 12(e).

The Government argues that Medina's waiver under Rule 12(e) bars our review even for plain error under Fed. R. Crim. P. 52(b). When faced with a defendant's complete failure to file a pretrial suppression motion, we have held that "we are categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal." *United States v. Crismon,* 905 F.2d 966, 969 (6th Cir. 1990). On the other hand, we have applied Rule 52(b)'s plain error review to new suppression arguments raised for the first time on appeal after a defendant's original suppression arguments proved unsuccessful at the trial court level. *See Critton*, 43 F.3d at 1094.

Regardless of whether a Rule 12(e) waiver precludes plain error review under Rule 52(b), it is clear that Medina's arguments would not prevail under plain error review. The plain error doctrine is to be used only in exceptional circumstances to avoid a miscarriage of justice. *Critton*, 43 F.3d at 1094. An error is plain when it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings. *Johnson v. United States*, 520 U.S. 461, 466–67 (1997). We conclude that the district court committed no obvious error in denying Medina's suppression motion.

Evidence obtained from a search may be inadmissible if the consent to search was obtained from an individual seized in violation of his or her Fourth Amendment rights. *United States v. Lopez-Arias*, 344 F.3d 623, 628–29 (6th Cir. 2003). When an individual consents to a search subsequent to an illegal seizure, the evidence obtained must be excluded unless "the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will." *Id.* at 629. A "seizure" occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave. *United States v. Obasa*, 15 F.3d 603, 606 (6th Cir. 1994). If a seizure involves only a brief investigatory detention and frisk, the officers need only have a reasonable suspicion of criminal activity to satisfy Fourth Amendment requirements. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). When a seizure rises to the level of a formal or informal arrest, however, it must be supported by probable cause, *Dunaway v. New York*, 442 U.S. 200, 212–14 (1979), which consists of knowledge of facts and circumstances that "are sufficient to warrant a prudent person, or one of reasonable caution, [to believe], in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense," *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Medina had clearly been "seized" by Mundy and Hampton at the time he consented to a search of his home. He had been patted down and was not free to leave. In fact, the Government conceded at oral argument that Medina had been seized. The Government argues, however, that Medina's seizure constituted a mere investigatory stop and not a full-fledged arrest, and that the agents had the requisite reasonable suspicion of criminal activity at the time the seizure occurred. Medina argues that the seizure amounted to an arrest without probable cause and therefore violated Medina's Fourth Amendment rights.

In determining whether a seizure amounts to an arrest or a mere investigatory detention, we consider factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *Lopez-Arias*, 344

F.3d at 627 (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). In particular, transportation to a police station for questioning, *see Hayes v. Florida*, 470 U.S. 811, 815–16 (1985); *Dunaway v. New York*, 422 U.S. 200, 212 (1979), or to the back of a police vehicle for questioning, *see United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991), can transform an investigatory stop into an arrest. The reading of *Miranda* rights, while not dispositive, is also evidence that a stop has become an arrest. *Lopez-Arias*, 344 F.3d at 628.

The record is insufficient to support a finding, upon plain error review, that Medina had been arrested. While it appears that some physical contact was used in escorting Medina into the residence, Medina was not handcuffed and the agents' firearms were concealed. There is no evidence that any serious physical force was used or threatened. The frisk of Medina was consistent with a *Terry*-type investigatory stop. The reading of Medina's *Miranda* rights did not, by itself, transform the stop into an arrest. *Lopez-Arias*, 344 F.3d at 628.

The most compelling factor supporting a finding that Medina was arrested was the agents' transport of Medina from the street to the surveillance residence for questioning. "[T]he removal of a suspect from the scene of the stop generally marks the point at which the Fourth Amendment demands probable cause." *Centanni v. Eight Unknown Officers*, 15 F.3d 587, 591 (6th Cir. 1994). Even so, an officer may move a suspect or use greater force against a suspect, without probable cause, if safety concerns justify such precautions. *See Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 814–15 (6th Cir. 1999). On the other hand, where the record does not "support a finding that . . . legitimate law enforcement purposes . . . were furthered" by moving a suspect from a public area to a police interrogation room, the detention is deemed an arrest and must be supported by probable cause. *Florida v. Royer*, 460 U.S. 491, 505 (1983). Because Medina failed to raise his unlawful seizure argument before the district court, the record contains no discussion of the factors that may have led the agents to escort Medina off the street before questioning him. Given the state of the record, we cannot conclude under plain error analysis that the officers' transportation of Medina transformed what was otherwise an investigatory stop into an arrest.

Absent an arrest, the officers needed only reasonable suspicion to satisfy the Fourth Amendment. The determination of "reasonableness" depends on a balance between the "need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21. The record does not support a finding, upon plain error review, that the officers lacked reasonable suspicion when they seized Medina. The agents had watched Medina change the license plates on his van, leave and return multiple times in a short period, and receive visitors who unloaded and loaded bags from their vehicles and then quickly departed. One of the individuals who had departed from Medina's residence had just engaged law enforcement agents in a high-speed chase. Furthermore, because Medina failed to raise his illegal seizure argument at the trial level, the record is incomplete regarding the information available to the agents at the time they stopped Medina. Specifically, we note that the record lacks any information regarding why Medina's house was targeted for surveillance. Mundy testified that he knew Medina's identity before approaching him, and had conducted a DEA database search on him, but did not testify specifically as to how he became familiar with Medina's identity nor what the background search had revealed. On these facts, we conclude that Medina has not established a lack of reasonable suspicion under plain error analysis.

We therefore AFFIRM the district court's denial of Medina's motion to suppress.

## IV. Errors in admission of evidence

Medina makes several arguments related to the district court's alleged errors in admitting evidence. We review a district court's decision to admit evidence for abuse of discretion, which

occurs when the district court "relies on clearly erroneous findings of fact, . . . improperly applies the law, or . . . employs an erroneous legal standard." *United States v. Baldwin*, 418 F.3d 575, 579 (6th Cir. 2005) (alteration in original) (citation omitted). Even when the district court has abused its discretion in admitting evidence, we do not reverse a conviction if the error is harmless, meaning that "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 582 (citation and quotation marks omitted). A guilty verdict for conspiracy under 21 U.S.C. § 846 requires (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy. *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996). Thus, we will first examine each of the evidentiary issues raised for abuse of discretion, and then turn to whether any such errors may have contributed to the jury's verdict of guilt for conspiracy.

## A. Abuse of discretion

### 1. Admission of criminal histories of Gary Jackson and Robert Corona

Medina argues, and the Government concedes, that the district court abused its discretion by allowing the Government to introduce into evidence a judgment of conviction against a man named Robert Corona, an alleged acquaintance of Medina's, for conspiracy to possess cocaine with intent to distribute. Medina further argues that the district court abused its discretion by allowing the Government to admit mug shots of Gary Jackson and Corona, as well as a Presentence Investigative Report of Corona.[3] We agree that the court abused its discretion in admitting each of these items.

Evidence is only admissible if it is relevant, that is, if it tends to demonstrate that a fact of consequence to the action is more or less probable than it would be without the evidence. Fed. R. Evid. 401, 402. Furthermore, a trial court may exclude evidence even when relevant if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Evidence that demonstrates only "guilt by association," such as evidence of a family member's criminal history, is irrelevant to the question of a defendant's actual guilt. *See United States v. Cunningham*, 804 F.2d 58, 61–62 (6th Cir. 1986); *see also United States v. Polasek*, 162 F.3d 878, 884, 885 n.2 (5th Cir. 1998) (collecting cases from other circuits holding that guilt-by-association evidence violates Rule 401, Rule 403, or both.).

Evidence of Corona's prior convictions was clearly irrelevant to Medina's guilt, as the evidence was used only to demonstrate that Medina knew a criminal. A jury may not infer membership in a conspiracy by mere association of individuals with one another. *United States v. Gibbs*, 182 F.3d 408, 423 (6th Cir. 1999). Evidence of Jackson's criminal history was also irrelevant. This is so despite the evidence suggesting Jackson's involvement in the present case such as his departure from Medina's house and flight from the police, because evidence of even a co-defendant's prior convictions is irrelevant to the determination of a defendant's guilt. *United States v. Taylor*, 210 F.3d 311, 317 (5th Cir. 2000). All of the evidence pertaining to Corona's and Jackson's criminal histories should have been excluded, and we conclude that the district court abused its discretion by allowing admission of the judgment as well as the two mug shots.

### 2. Agents' expert testimony

Medina also alleges that the district court abused its discretion by allowing Mundy and Riddle to testify as "experts" regarding the common practices of drug traffickers. Medina argues

---

[3]As Medina notes, the record is unclear as to whether Corona's PSR was submitted to the jury. Because our ultimate concern is risk of prejudice, we assume that it was submitted.

that the agents' testimony was unreliable, and further argues that the district court should have instructed the jury regarding the agents' dual roles as fact and expert witnesses.

At trial, Medina's counsel raised several objections that can reasonably be interpreted as objections to expert testimony from Mundy and Riddle, and we therefore review the district court's admission of the testimony for abuse of discretion. Medina's counsel raised objections when Mundy and Riddle offered certain opinion testimony, such as Mundy's belief that Medina was engaging in counter-surveillance while riding his bicycle around the neighborhood, and both Mundy's and Riddle's belief that certain scraps of paper were drug ledgers and the numbers contained therein corresponded to kilograms of cocaine and dollar amounts. Medina's counsel also objected at trial when Mundy and Riddle offered testimony regarding what items of Medina's they had seen before in the drug trade, such as vacuum sealers, scraps of paper with lists of numbers, and packaging similar to those found in Medina's residence. We conclude that the district court did not abuse its discretion in overruling these objections and in permitting Mundy and Riddle to testify as experts on drug trafficking.

The Supreme Court has held that trial courts have an obligation to ensure that expert testimony "is not only relevant, but reliable," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), and we have applied this standard specifically to law enforcement agents testifying as experts on drug trafficking. *United States v. Harris*, 192 F.3d 580, 588–89 (6th Cir. 1999). We have consistently found testimony such as Mundy's and Riddle's to be relevant, noting that "[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror." *United States v. Thomas*, 74 F.3d 676, 682 (6th Cir. 1996), *abrogated on other grounds by General Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). Nor can Medina establish that the agents' testimony was unreliable: Mundy testified to having seventeen years of DEA employment, and Riddle six years, and both had extensive other prior experience and training in investigating narcotics-related crimes. Given the agents' obvious qualifications, *see United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996) (finding a law enforcement agent with nine years of experience to be qualified to give expert testimony), no abuse of discretion occurred in the district court's failure to qualify the witnesses formally before allowing their expert testimony. *United States v. DeClue*, 899 F.2d 1465, 1473 (6th Cir. 1990).[4]

Medina further argues that the district court abused its discretion by allowing the agents to testify as both fact and expert witnesses without giving the jury a cautionary instruction regarding their dual roles. Although we have not categorically prohibited an officer from testifying as both a fact witness and an expert witness, we have noted that "both the district court and the prosecutor should take care to assure that the jury is informed of the dual roles of a law enforcement officer as a fact witness and an expert witness, so that the jury can give proper weight to each type of testimony." *Thomas*, 74 F.3d at 683. Because Medina failed to object to the jury instructions during trial, we again review for plain error. *Johnson*, 520 U.S. at 466–67.

In past cases we have permitted an officer's dual testimony as a fact and expert witness when an adequate cautionary jury instruction was provided. In *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000), for example, we found no abuse of discretion in allowing an agent to testify in a dual capacity where the court "instructed the jury, both before [an agent] gave his opinion and again in the jury charge, that it should consider [the agent's] dual roles in determining what weight, if any, to give [his] expert testimony." In cases where the jury was not explicitly cautioned regarding a law

---

[4]Medina also raises an argument in his Reply Brief that the prosecutor should have disclosed that he intended to use Agents Mundy and Riddle as experts. This argument was not raised in Medina's Main Brief, and we do not address it. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (deeming arguments that are not raised in the appellant's main brief, or raised merely in a perfunctory manner, as waived).

enforcement agent's "dual role," the jury instructions have at least included an instruction on how to weigh expert opinion testimony. In *United States v. Swafford*, for instance, we found no error in permitting a DEA agent to give opinion testimony, because the jury was specifically instructed:

> [The agent] was offered as an expert in the area of methamphetamine investigations. An expert witness has special knowledge or experience that allows the witness to give an opinion. You do not have to accept an expert's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions as well as any other factors you think are relevant to determining whether the expert is a credible witness.

385 F.3d 1026, 1030 (6th Cir. 2004). Likewise, in *Thomas*, the jury was given an instruction specific to expert witness testimony:

> You should consider each expert opinion received in evidence in this case, and give it such weight as you may think it deserves. If you should decide that the opinion of an expert witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion entirely.

74 F.3d at 683. Such instructions are absent here.

The Government points out that the instruction given to the jury at Medina's trial included language stating that the testimony of government agents "is not entitled to any greater weight," and that "it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement agent witness on the grounds that his or her testimony may be colored by a personal or professional interest in the outcome of the case." JA 309. This instruction, however, does not address the particular concerns that may arise when an officer gives expert opinion testimony. A general instruction on weighing officer testimony does not guard against a jury mistakenly weighing opinion testimony as if the opinion were fact, nor does it instruct the jury that they are free to reject the opinions given. Nor does such a general instruction regarding possible law enforcement bias address the additional risk of bias in forming expert conclusions regarding one's own investigation. Here, no instruction on expert witness testimony was given, let alone an instruction on the agents' dual role as fact and expert witnesses. We conclude that the jury instruction given was insufficient to guard against the risk of confusion inherent when a law enforcement agent testifies as both a fact witness and as an expert witness.

The agents' testimony at Medina's trial also lacked any clear demarcation between expert and fact witness roles. We have considered such demarcation as a factor that may ameliorate the risk of jury confusion regarding dual role testimony. Thus, in finding no abuse of discretion in *Thomas*, we focused not only on the district court's cautionary instruction, but also on the fact that the prosecutor "delineate[d] the transition between the examination of [the law enforcement agent] as an expert witness and questions relating to his role as a fact witness." 74 F.3d at 683. Likewise, in *Tocco*, we found no abuse of discretion because we noted, in addition to the presence of a cautionary jury instruction, that the agent's "dual roles were emphasized to the jury by the fact that he testified at two different times – once early in the trial as a fact witness, and again at the conclusion of trial as an expert witness." 200 F.3d at 419.

Here, in contrast to *Thomas* and *Tocco*, no clear demarcation existed between Mundy's testimony regarding his investigation of Medina's home and his testimony regarding his prior experiences in the field of narcotics. In the course of describing the packages found in Medina's home, Mundy testified that he had seen similar packages "on numerous occasions . . . across the

country" and had found cocaine inside them. JA 497–98. Mundy testified about how cocaine would "usually" be packaged by being pressed into a block, heat-sealed or sealed with Saran wrap, and marked to denote the owner; Mundy was then immediately asked to observe the wrappers found in Medina's home and testify to how they had been heat-sealed and marked with numbers. Mundy testified that vacuum sealers were found in Medina's home, then immediately was asked "[i]n the context of a drug investigation, what [he had] seen that being used for," to which he responded that he had seen them used to repackage cocaine once it had been received. JA 527. Mundy testified to seeing Medina leave his home on bicycle, and immediately volunteered: "It's common practice. And what I believed him to be doing was doing counter surveillance." JA 475. Although Medina's counsel objected to Mundy's statement of his belief, and the court sustained the objection, the court provided no instruction to the jury to disregard the statement. Mundy testified that he smelled ether when he first opened the bag of currency found in Medina's home, and then was immediately asked to explain how he was familiar with the smell of ether, to which he responded that it is "commonly used in the production of cocaine, HCL cocaine base," and that he had smelled it "on thousands of occasions." JA 565-66. Mundy was asked to examine and to describe scraps of paper found in Medina's apartment, then immediately testified that "[b]ased upon [his] expertise of the Spanish language," some the numbers on the scraps of paper represented kilograms or dollar amounts. JA 598. In sum, Mundy's testimony essentially amounted to an expert opinion that the items he himself had found in Medina's home demonstrated a conspiracy to distribute cocaine.

Riddle's testimony was similar. Riddle provided fact testimony regarding his investigation of Gary Jackson. He then provided opinion testimony concerning the evidence he had been shown that was recovered from Medina's home, including his opinion that the plastic packages covered in duct tape were "consistent with kilograms of cocaine that [he] had previously seized . . . in Nashville . . . and also seen in other seizures in the Middle District of Tennessee," his opinion that the documents found in Medina's home were "drug ledgers for a narcotics trafficker," and his belief regarding the meaning of the numbers written in those "ledgers." JA 788–89.

Because there was no cautionary jury instruction regarding the agents' dual witness roles nor a clear demarcation between their fact testimony and expert opinion testimony, we conclude that the district court committed an error that was plain or obvious in permitting the dual-role testimony.

Having demonstrated obvious error, Medina must establish an effect on his substantial rights, and a serious impact to the fairness, integrity or public reputation of the judicial proceeding, to fulfill the further requirements of the plain error test. *Johnson*, 520 U.S. at 466–67. An effect on substantial rights is typically established through a showing of an actual effect on the outcome of the case. *United States v. Jones*, 108 F.3d 668, 672 (6th Cir. 1997) (en banc). Our plain error analysis of this evidentiary issue therefore dovetails with the analysis of prejudice required for all district court evidentiary determinations. *See Baldwin*, 418 F.3d at 582. We discuss the issue of prejudice as it pertains to all of the evidentiary issues raised by Medina in Part IV.B below. As discussed in that section, we conclude that the district court's error in its jury instruction, in conjunction with the other evidentiary errors we find occurred in Medina's trial, may have affected the outcome of his trial and therefore warrants a reversal of his conviction. Thus, Medina can establish an effect on his substantial rights.

Finally, we conclude that the error at issue here seriously impacted the fairness, integrity, or public reputation of judicial proceedings. Our exercise of remedial discretion under Rule 52(b) in direct appeals, unlike collateral review, is not limited to correcting errors in cases of actual innocence. *Jones*, 108 F.3d at 672–73. We conclude that permitting police officers to testify as experts in their own investigations and give opinion testimony on the significance of evidence they have collected, absent any cautionary instruction, threatens the fairness, integrity, and public reputation of judicial proceedings, regardless of whether the defendant is actually innocent.

### 3.          **Admissibility of drug ledgers**

Medina argues that the DEA agents' reference to the contents of several scraps of paper, which the agents characterized as "drug ledgers," constituted inadmissible hearsay evidence that violated Medina's rights under the Confrontation Clause of the Sixth Amendment. Because Medina did not raise a hearsay objection to the admission of the drug ledgers in district court, we review the admission of the evidence for plain error, requiring an error that is clear or obvious, affecting a defendant's substantial rights, and seriously affecting the fairness, integrity or public reputation of judicial proceedings. *United States v. Wilson*, 168 F.3d 916, 920 (6th Cir. 1999).

The Confrontation Clause of the Sixth Amendment protects a criminal defendant's right "to be confronted with the witnesses against him." The Confrontation Clause permits the use of out-of-court statements that are offered to prove the truth of the matter asserted in a criminal trial only where the statements fall within a "firmly rooted hearsay exception" or otherwise bear "particularized guarantees of trustworthiness." *United States v. Martinez*, 430 F.3d 317, 328 (6th Cir. 2005) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)). The admission of a co-conspirator's statements under Fed. R. Evid. 801(d)(2)(E) is among the recognized firmly rooted hearsay exceptions. *Bourjaily v. United States*, 483 U.S. 171, 184 (1987).[5] Before a statement offered to prove the truth of the matter asserted may be entered into evidence against a defendant under Fed. R. Evid. 801(d)(2)(E), the government must show by a preponderance of evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the statement was made in the course and furtherance of the conspiracy. *Martinez*, 430 F.3d at 325. These three-part findings, referred to as the *Enright* findings in light of our holding in *United States v. Enright*, 579 F.2d 980, 986–87 (6th Cir. 1978), must be made by the trial court. *Martinez*, 430 F.3d at 325. Although the district court may consider the hearsay statements themselves in determining whether a conspiracy existed in which both the declarant and the defendant participated, the statements cannot alone suffice to satisfy the evidentiary burden. *Wilson*, 168 F.3d at 921. We conclude that the district court's admission of the drug ledgers here did not constitute a clear or obvious error.

As an initial matter, we conclude that the notations found in the drug ledgers were used to prove the truth of the matters asserted. The agents' opinion testimony regarding the meaning of the scraps of paper was used to prove the number of shipments in the alleged conspiracy, the quantity of drugs sold in each shipment, and the selling price of the shipments. In its closing argument, the prosecution summarized the contents of the documents to prove the elements of the conspiracy charge: "Remember *primera transportacion* – that's first transportation – was 73 boxes or kilos. Caja No. 2, second load, was roughly 74 kilos. For about 147 kilos total." JA 862 (referring to document at JA 224). The prosecution continued to refer to the contents of the documents to explain further why more money was not recovered from Medina's home, explaining that there was a "Round 1, Round 2, Round 3, Round 4," rounds of shipments in which Medina was allegedly "[s]ending out $575,000." JA 863 (referring to document at JA 222). The prosecution continued, "The money wasn't there because the money had been sent by a young girl, a young man, by trailer, and various other transfers of money," referring to the words "muchacho," "muchacha," and "trailer" written across from "1 Round," "2 Round," and "3 Round" in the alleged drug ledger. JA 863. The prosecution added, "And remember how [the ledgers] were split up. He kept track of received cocaine, Cajas, and sent out money. He kept track of money bundles being put together. 17 times 20 equals 340, for a total of half a million." JA 867. The Government's use of the documents against Medina is in clear contrast with those cases in which the alleged drug ledgers were found to be more akin to physical evidence than to hearsay statements because the statements themselves

---

[5]Such co-conspirator statements are considered nontestimonial and their admissibility is not affected by the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). *See Martinez*, 430 F.3d at 328–29.

were not central to the government's case. *See, e.g., United States v. Echeverri*, 982 F.2d 675, 680 (1st Cir. 1993); *United States v. Wilson,* 532 F.2d 641, 645–46 (8th Cir. 1976)**.**

To prove the first *Enright* factor, the existence of a conspiracy, the prosecution must establish that there was:

> (1) an object to be accomplished. (2) a plan or scheme embodying means to accomplish that object. (3) an agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.

*Gibbs*, 182 F.3d at 420. The agreement need not be formal, and may consist of a tacit understanding inferred from the interdependence of different portions of a single enterprise. *Id.* Nevertheless, a mere buyer-seller relationship does not constitute a drug conspiracy. *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004).

Since the drug ledgers themselves cannot alone establish the existence of a conspiracy under the *Enright* test, *see Wilson*, 168 F.3d at 921, we must look to the rest of the record. Although Jackson's visit to Medina's residence and subsequent flight from the police are suspicious, these actions are consistent with a mere buyer-seller relationship between the two. *See United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990) (finding mere presence at time of drug bust was insufficient evidence of agreement). We have said that the trust involved in "fronting" drugs to a buyer before payment is complete may demonstrate more than a mere buyer-seller relationship, *see Henley*, 360 F.3d at 514, but the record contains no direct evidence that Medina was on either end of a fronting arrangement. Mundy testified only that "fronting" is a common practice in drug trafficking, and the jury was invited to speculate that the amount of money recovered was less than expected for a 150-kilogram cocaine deal because some drugs were "fronted."

On the other hand, the large quantity of opened wrappings, numerical markings on the wrappings that Mundy testified were consistent with typical markings used to denote different drug dealers' shipments within a single "piggybacking" load, heat-sealing equipment, scales, and unidentified white powder consistent with "cut," all suggest that someone in Medina's residence was receiving large shipments of drugs from multiple sellers and repackaging them for resale. We have recognized that drug distribution conspiracies often take the form of "chain" conspiracies involving "numerous sales and resales of drugs until they reach the ultimate consumers," *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982), and that in such circumstances a common scheme or plan can be inferred despite the absence of a formal agreement because of the "interdependence of the enterprise," *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999). We have also noted that large quantities of drugs, such as a kilogram or more, support an inference of a conspiracy. *Id.* at 747. Furthermore, Medina's interaction with the individual in the red truck suggests some level of trust and cooperation beyond a mere buyer-seller relationship, given that the truck picked up and dropped off Medina at his residence, the truck made two visits to Medina's residence in a short period of time, and the driver was assisted by Medina when unloading the suitcases. We therefore conclude that, under a plain error standard, the Government established by a preponderance of evidence the existence of a drug conspiracy.

The Government was also required to establish that both Medina and the author of the drug ledgers were involved in the conspiracy and that the statements contained in the documents were made in furtherance of the conspiracy. In a case in which the author of a drug ledger was unknown, the Ninth Circuit found that the Government failed to fulfill its burden of tying the document to the conspiracy or to the defendant. *United States v. Mouzin*, 785 F.2d 682, 692–93 (9th Cir. 1986). In this case, however, the documents at issue were found in Medina's residence. Unlike the Ninth

Circuit, *see United States v. Ordonez*, 737 F.2d 793, 800 (9th Cir. 1984), we have held that possession of documents constitutes adoptive admission, particularly when no objection was made at trial to the admissibility of documents found, *see United States v. Marino*, 658 F.2d 1120 (6th Cir. 1981). Here the documents were found in Medina's basement and he has not disclaimed ownership of them until now. Medina's involvement in narcotics trade is further established through the testimony of Terry Strayn. In addition, Medina's consciousness of guilt may be inferred from his dishonest responses to Mundy's questioning, further suggesting Medina's involvement in whatever illicit activity occurred in his residence. Furthermore, Mundy and Riddle provided lengthy testimony linking the documents to the alleged conspiracy. The words and numbers as interpreted by the agents are consistent with a plan to deliver, and receive payment for, several shipments of cocaine totaling approximately 150 kilograms, consistent with the other circumstantial evidence available in this case. Under plain error review, we cannot conclude that the Government failed to establish by a preponderance of the evidence that Medina was involved in the conspiracy or that the documents at issue were in furtherance of the conspiracy.

Because we conclude that it would not be a clear or obvious error to find that the Government demonstrated by a preponderance of the evidence the existence of a conspiracy, Medina's involvement in the conspiracy, and the drug ledgers' use in furtherance of the conspiracy, admission of the documents at issue did not violate Medina's rights under the Confrontation Clause.[6]

## B. Prejudice

Having found that the district court abused its discretion in admitting evidence of the criminal histories of Medina's acquaintances and in permitting dual fact and expert witness testimony without a cautionary instruction to the jury, we may affirm the resulting conviction only if "it appears beyond a reasonable doubt that the error[s] complained of did not contribute to the verdict obtained." *Baldwin*, 418 F.3d at 582. Medina argues that the erroneously admitted evidence may have prejudiced the jury, warranting a remand. Medina also argues that the record is unclear as to whether Corona's Presentence Investigation Report was submitted to the jury, which we interpret as another argument that the evidentiary errors of the district court may have been prejudicial. The Government argues that any error was not prejudicial given the sheer weight of other evidence against Medina, and therefore reversal of Medina's conviction is inappropriate. We agree with Medina that his conviction must be vacated.

Medina was convicted of conspiracy under 21 U.S.C. § 846, which required the Government to prove (1) an agreement to violate drug laws, (2) Medina's knowledge and intent to join the conspiracy, and (3) Medina's participation in the conspiracy. *See Martinez*, 430 F.3d at 330 (citing *United States v. Welch*, 97 F.3d 142, 148–49 (6th Cir. 1996)). The most powerful evidence tying Medina to a conspiracy is the very evidence we have deemed problematic: the opinion testimony of the DEA agents without a proper instruction, and the evidence of Medina's acquaintances' prior conspiracy convictions.

If the jury had not seen or heard any evidence regarding the drug convictions of Medina's acquaintances, and if the jury had received a cautionary instruction that it was free to weigh and reject the DEA agents' opinions regarding evidence found in Medina's home, we cannot conclude

---

[6]Medina asserts generally as Issue VII of his brief that the trial court repeatedly allowed admission of prejudicial hearsay evidence in violation of the Confrontation Clause, but states that "[s]pace limitation prohibits counsel from itemizing all the prejudicial hearsay which th[e] jury was provided," referring the panel to its Arguments III through VI where "[s]pecific types of hearsay have been addressed." It is well established that issues adverted to merely in a perfunctory manner in an appellant's main brief are deemed waived, *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997), and we decline to address Medina's hearsay arguments beyond those discussed specifically in Part II.A.3 above.

beyond a reasonable doubt that the jury's verdict would have been the same. Mug shots, in particular, are highly prejudicial, and their visual impact can leave a lasting impression on a jury. *See United States v. McCoy*, 848 F.2d 743, 745–46 (6th Cir. 1988). Furthermore, the prosecutor referred to Jackson as a "multi-convicted drug felon" and a "multi-convicted cocaine dealer" in his closing arguments, and asserted that Jackson and Medina trusted each other because they were "co-conspirators" and "partners in crime." JA 839, 843. He further asserted, in response to defense counsel's argument that the Government had not proven the alleged conspiracy involved cocaine as opposed to another controlled substance, that "Gary Jackson doesn't have convictions for methamphetamine, he has convictions for cocaine." JA 864. These comments reinforced the impact of the improper guilt-by-association evidence that had been introduced. We conclude that the introduction of Corona's and Jackson's mug shots and criminal history to the jury here compels that we vacate Medina's conviction. The district court's additional error in failing to instruct the jury on Mundy's and Riddle's dual role as fact and expert witnesses further buttresses our conclusion of prejudice.

We therefore VACATE Medina's conviction and statements, and REMAND this case for further proceedings.

## V. Medina's motion for judgment of acquittal

Medina argues that the district court erred in failing to grant his motion for a judgment of acquittal on the ground that the prosecution offered insufficient evidence to support a guilty verdict. Our decision to vacate Medina's conviction due to the district court's error in admission of evidence "does not . . . obviate the need to review the sufficiency of the evidence." *United States v. Quinn*, 901 F.2d 522, 529 n.5 (6th Cir. 1990). We review the district court's denial of the motion de novo. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). A judgment of acquittal is appropriate where the court determines, after reviewing the evidence in the light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* In this context, we do not "weigh the evidence, assess the credibility of the witnesses, or substitute our judgment for that of the jury." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001) (quoting *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994)). The Government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt. *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 2001). Although we have concluded that certain evidence in Medina's trial was improperly admitted, we nevertheless consider the erroneously admitted evidence as well as the properly admitted evidence in reviewing the sufficiency of the evidence to determine whether Medina is entitled to a judgment of acquittal. *Quinn*, 901 F.2d at 529–30 (citing *Lockhart v. Nelson*, 488 U.S. 33–34 (1988)).

Medina was charged with conspiracy to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841 and 846. To sustain a conviction of conspiracy, the Government must prove (1) an agreement to distribute, or an agreement to possess with intent to distribute, cocaine, (2) Medina's knowledge and intent to join the conspiracy, and (3) Medina's participation in the conspiracy. *See Martinez*, 430 F.3d at 330. The agreement may be tacit and may be inferred from the interdependence of different portions of a single enterprise. *Gibbs*, 182 F.3d at 420. Although a single buyer-seller interaction does not constitute a drug conspiracy, *Henley*, 360 F.3d at 514, a conspiracy may take the form of a pre-arranged "chain" of drug sales and resales until the drugs reach a street-level consumer. *Warner*, 690 F.2d at 549. Once a conspiracy is established beyond a reasonable doubt, Medina's connection to the conspiracy need only be slight, *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997), and his knowledge and participation in the conspiracy may be inferred from his conduct, *Salgado*, 250 F.3d at 447.

We conclude that the evidence in Medina's case is sufficient to permit a rational trier of fact to find Medina guilty beyond a reasonable doubt, making a judgment of acquittal inappropriate. The jury heard testimony that a canine trained in narcotics detection had exhibited behavioral changes in three different locations at Medina's residence, indicating it had detected some narcotics odor, and had given a "final response" in one location in Medina's basement, indicating it had identified the source of a narcotics odor. Although Medina stressed in oral argument that the dog's "final response" was on a bag containing United States currency, which could have been contaminated long before Medina received it, the evidence need not rule out every hypothesis other than guilt in order to sustain a jury conviction. *See Jackson*, 55 F.3d at 1225. Having seen surveillance video coverage of several individuals carrying suitcases and duffle bags to and from Medina's residence over a short period of time, a reasonable jury could infer that transactions of some sort occurred. A jury could have inferred that an illicit transaction transpired between Medina and Jackson, given not only Jackson's prior drug conspiracy convictions, but also his high-speed flight from the police immediately after his departure from Medina's residence. Based upon Medina's implausible explanation that the currency found in his residence was payment for a used car worth substantially less, a jury could have inferred that the money was payment for an illicit transaction. A jury could infer Medina's consciousness of guilt from other implausible answers given to Mundy's questions, including his insistence that he was unaware of surveillance cameras and instead chasing a garden snake, his initial denial that Jackson had been to his house and subsequent claim that Jackson had visited to purchase a used vehicle in poor condition for over $45,000, and his explanation that a shower overflow accounted for wet plastic baggies found near a commode. A jury could have inferred that the heat-sealers, plastic wrappings, and scales found in Medina's home were used to package narcotics, and that the grease residue found on some of the plastic wrappings was consistent with grease commonly used to mask the odor of narcotics. Finally, a jury could also have credited the testimony of Terry Strayn, who said that Medina had admitted to him that he had been involved in drug dealing.

Sufficient evidence also existed to establish that Medina was trafficking cocaine, as opposed to methamphetamine or any other substance. As the Government noted in its closing argument, Jackson had a criminal history involving cocaine distribution. Even if the jury ignored this improperly admitted evidence, the jury could have again credited the testimony of Strayn, who said Medina told him he was dealing in cocaine. A jury could have also credited the testimony of Mundy and Riddle that the wrappers found in Medina's home were most consistent with the size and shape of cocaine packaging. The jury could have concluded that the white powder found in Medina's garage was consistent with substances that Mundy described were frequently used to "cut" cocaine. Finally, a jury could have credited Mundy's and Riddle's testimony that some of the numbers found in the drug ledgers corresponded to the wholesale price of cocaine.

Sufficient evidence existed that the drug trafficking involved at least five kilograms of cocaine. A jury could have believed Strayn's testimony that Medina said he had sold around 150 kilograms. A jury could have credited Mundy's and Riddle's interpretation of the alleged drug ledgers as referring to a 73-kilogram shipment of cocaine. A jury could also have inferred a large drug quantity had been sold based upon the large number of "kilogram wrappers" found in Medina's basement.

The circumstantial evidence presented was also sufficient for a reasonable jury to find beyond a reasonable doubt the existence of an agreement to distribute cocaine, as opposed to Medina's mere purchase or sale of cocaine. A jury could have credited Mundy's and Riddle's expert opinion testimony that markings found on plastic wrappers were consistent with codes referring to different drug sellers, and that the wrappings were consistent with the common practice of "piggybacking" different loads. A jury could have inferred a conspiracy from the involvement of different seller codes, the sheer amount of cocaine allegedly involved, and the materials available for weighing and repackaging cocaine for resale. A jury could have inferred agreement and

cooperation between Medina and the driver of the red truck based upon their frequent interactions in a short time frame, Medina's assistance in carrying suitcases from the driver's truck, and Medina's riding in the truck. A jury also could have credited the agents' expert testimony regarding the drug ledgers, and inferred a conspiracy from the keeping of records regarding the progress of different shipments and payments.

Viewed in the light most favorable to the Government, a rational jury could conclude that the above evidence demonstrates beyond a reasonable doubt Medina's involvement in a conspiracy to distribute or conspiracy to possess with intent to distribute five or more kilograms of cocaine. We therefore AFFIRM the district court's denial of Medina's motion for a judgment of acquittal.

## VI.  Medina's remaining arguments

Having concluded that Medina is entitled to a remand for retrial due to the likely prejudice of certain inadmissible evidence, we need not address Medina's argument that he is entitled to a remand due to prosecutorial misconduct. This argument centers around the prosecutor's repeated reliance upon the inadmissible evidence discussed in Part IV. Having clarified that the evidence at issue was in fact improperly admitted and sufficiently prejudicial to warrant a new trial, we need not further consider whether the prosecutor's actions constituted prosecutorial misconduct. Finally, having vacated Medina's conviction and sentence, we need not reach Medina's arguments pertaining to errors in sentencing.

## VII.  Conclusion

For the foregoing reasons, we VACATE Medina's conviction and sentence, and REMAND for proceedings consistent with this opinion.