*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            *v.*

ANTHONY C. WILLOUGHBY,
                    *Defendant-Appellant.*

No. 12-3822

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:10-cr-00431-1—Jack Zouhary, District Judge.

Argued: November 22, 2013

Decided and Filed:  January 30, 2014

Before:  SUTTON and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

─────────────────

## COUNSEL

**ARGUED:** Angela Hayden, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellant.  Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Ann Arbor, Michigan, for Appellee.  **ON BRIEF:** Angela Hayden, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellant.  Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Ann Arbor, Michigan, for Appellee.

─────────────────

## OPINION

─────────────────

    KETHLEDGE, Circuit Judge.   The jury in this case found that Anthony Willoughby had prostituted a 16-year-old runaway girl in violation of 18 U.S.C. § 1591. The district court sentenced him to 30 years in prison.  Willoughby presents a raft of

─────────────

[*]The Honorable Robert M. Dow, United States District Judge for the Northern District of Illinois, sitting by designation.

arguments on appeal, most of which are meritless. The exceptions are certain of the district court's evidentiary rulings at trial; but neither of those errors provide us any ground to grant relief. We therefore affirm.

I.

In January 2009, a 16-year-old girl (whom we call SW) ran away from her foster home with nothing but her purse. Over the next two weeks, SW stayed with a series of friends and acquaintances—until one of them introduced her to Anthony Willoughby, a.k.a. "Party Time," a crack dealer and part-time pimp in Toledo. Willoughby was then 34-years-old and weighed 360 pounds. Willoughby told SW that she could live at his house with him and his eight-year-old daughter. Once there, SW was entirely dependent on Willoughby; she had no money or driver's license. Almost immediately, Willoughby began having sex with SW every day, oftentimes on a tan pillow in the living room. Willoughby also forced SW to engage in anal sex with him and to use anal beads.

One day, Willoughby asked SW if she had ever "sold [her] body." SW said no. Willoughby said she would "learn the game." SW felt that she had no choice but to comply, because she was "scared of him."

Willoughby kept the names and numbers of his prostitution "customers" in a notebook with Barbie stickers. He told SW to cold-call the customers, and gave her scripts to follow: to call herself "Jessica" or "Jasmine," to say that she had previously spoken to the customer on a chat line, to ask "do you want a show for 1 hour or 2," and to get directions to the customer's house. With Willoughby standing over her shoulder—at one point, when she became upset during a call, he passed her a note saying "Take a breath"—SW called the men on the list. Then she wrote down the result of each call—"just got off work, going to bed," "wrong #," "no answer"—next to each customer's name and number in the notebook.

But two of the customers—"Chip" (whom the police later identified as Albert Tusin), and "Ed" (whom they identified as Edward Miles)—each responded to SW's inquiry by asking her to come to his home. Willoughby instructed SW to charge $50 for

oral sex, $75 for intercourse, and $100 for both.  He also gave her undergarments to wear, two condoms for each visit, and instructions never to kiss the johns on the mouth. (That was reserved for Willoughby.)  He then drove SW to each man's house and waited outside while the man had sex with SW.  When SW returned to Willoughby's car, he made her give the john's money to him.  SW also had commercial sex with a third man, "Pistol," who came to Willoughby's house to buy crack; on that occasion Willoughby "offered" SW to Pistol directly.

Willoughby made other attempts to offer SW to johns.  He took her to a nearby hotel where a swingers' convention was in progress, and made her "dress[] up" and walk the halls.  That effort failed; Willoughby said that "they was [sic] people giving it up for free so who would want to pay."  One night Willoughby also took SW to Lagrange Street, a notorious prostitution "track" in Toledo, and left her there, alone, with instructions to "walk" for johns.  She did not find any, and eventually used a phone at a party store to call Willoughby for a ride home.  When Willoughby arrived, he was "upset" that she had not gotten any johns.

Willoughby began beating SW in March, once when she used his cellphone to make a personal call, and twice when she "wasn't obeying rules."  By the middle of that month, SW decided to try to leave him. To convince Willoughby to take her back to her foster parents, SW bit the inside of her lip hard enough to draw blood, and made herself vomit—"[t]o make him think I was throwing up blood, I was sick."  Willoughby eventually drove SW back to her foster home, but told her that, if she said anything, he would "take care of"—meaning harm—SW and her family.

SW's foster parents promptly called the police.  The next day, law-enforcement agents interviewed SW and obtained a search warrant for Willoughby's home.  There, they found the undergarments that Willoughby had bought for SW, a list of truck stops in nearby states, the notebook with Barbie stickers, another notebook in which Willoughby wrote rap lyrics about pimping, a camera with photos of SW, handwritten notes with phone numbers (including numbers for Miles and Tusin), a makeup bag with a condom in it, anal beads, and the tan pillow, among other things.

A jury thereafter convicted Willoughby of sex trafficking a minor through force, fraud, or coercion, in violation of 18 U.S.C. § 1591(a) and (b). The district court imposed a sentence of 360 months' imprisonment. This appeal followed.

II.

A.

Willoughby argues that the district court should have suppressed the evidence seized during the search of his home. In reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Hodge*, 714 F.3d 380, 384 (6th Cir. 2013).

"[I]tems to be seized pursuant to a search warrant must be described with particularity[.]" *Marcilis v. Twp. of Redford*, 693 F.3d 589, 601 (6th Cir. 2012). Willoughby contends that the warrant here fell short of that standard for two reasons. First, he says that the warrant recited a broad list of items "without specifying that those items have some connection to this case[.]" Thus, he suggests, the warrant left the officers free to search and seize whatever items they wished. We disagree: the warrant contained a global modifier that limited its scope to items that were related to a list of offenses for which there was probable cause to think Willoughby had committed. The warrant therefore supplied enough information to "guide and control the agent's judgment in selecting what to take[.]" *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011).

Second, Willoughby contends that the warrant was overbroad, *i.e.*, "that it include[d] items that should not be seized[.]" *Id.* (internal quotation marks omitted). But "[i]nfirmity due to overbreadth does not doom the entire warrant;" rather, it requires suppression only of any evidence seized pursuant to the part of the warrant that was overbroad. *Id.* (internal quotation marks omitted). And Willoughby has not identified any specific items of evidence that he thinks should have been suppressed—much less any that were seized pursuant to a part of the warrant that was somehow overbroad. (Willoughby also suggests that the affidavit in support of the warrant was not properly

sworn; but he does not develop that argument, so we do not consider it.)  The district court correctly denied the motion to suppress.

B.

Willoughby also raises several evidentiary issues on appeal.

1.

Willoughby argues that the district court wrongly applied Federal Rule of Evidence 412 to prevent him from cross-examining SW about an unrelated sexual-abuse allegation which she later recanted.  Specifically, in July 2008—while SW was living in a group home for foster children—she alleged that, on one occasion, she had engaged in sexual activity with a counselor there.  But thereafter the counselor passed a polygraph and SW withdrew the allegation, writing that she had "made the stories up."

The government filed a motion in limine to bar Willoughby from cross-examining SW about this recantation.  Willoughby responded that the recantation was probative of SW's truthfulness, which would make the recantation presumptively admissible under Rule 608(b).  During oral argument on the motion, the district court recognized that the recantation "might go towards [SW's] credibility," but concluded that her recantation was interwoven with her sexual conduct.  The court therefore held that Rule 412 barred Willoughby from cross-examining her about the recantation.  We review the court's decision for an abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997).

As amended in 2011, Rule 412 provides in relevant part:

**(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

> **(1)** evidence offered to prove that a victim engaged in other sexual behavior; or

> **(2)** evidence offered to prove a victim's sexual predisposition.

Here, testimony about SW's recantation was not "offered to prove that [SW] engaged in other sexual behavior"—because the testimony's whole predicate was that there was no "other sexual behavior" to begin with. For the same reason, the testimony was not "offered to prove [SW]'s sexual predisposition." Thus, by its terms, the Rule does not apply here.

The government responds that our decision in *United States v. Cardinal*, 782 F.2d 34 (6th Cir. 1986), requires the opposite conclusion. In *Cardinal*, we applied a prior version of Rule 412—the original 1978 one—to uphold the district court's exclusion of an allegedly false accusation of sexual misconduct. Since then Rule 412 has been amended three times and substantially rewritten—in part to "expand the protection afforded alleged victims of sexual misconduct[,]" but in part to "diminish some of the confusion engendered by the original rule[.]" Advisory Comm. Notes, 1994 Amendments. And the Committee Notes—not to mention the amended Rule itself—specifically make clear that "[e]vidence offered to prove allegedly false prior claims by the victim is not barred by Rule 412." *Id*. That of course is precisely the evidence at issue here; and thus the revised Rule 412 did not exclude it. (That the evidence did not fall within Rule 412(a) also refutes the government's suggestion that Willoughby was required to move for its admission under Rule 412(c)(1).)

The government also contended—at oral argument in the district court and before us—that the circumstances of SW's recantation were "suspect," and that any cross-examination regarding SW's recantation could therefore lead to "a mini-trial" about whether her recantation was true. That concern is misplaced: by its terms, Rule 608(b) would have barred the admission of any "extrinsic evidence" to prove the truth or falsity of SW's recantation. Moreover, the government failed to develop a record in support of its contention that the circumstances of SW's recantation were suspect—which means that the contention provides no basis to exclude evidence otherwise admissible under the Rules. Thus, the district court abused its discretion when it applied Rule 412 to exclude testimony about SW's recantation.

That leaves the question whether the error was harmless, *i.e.*, whether "it appears beyond a reasonable doubt" that the error made no difference to the verdict. *United States v. Freeman*, 730 F.3d 590, 595 (6th Cir. 2013). Willoughby argues that we cannot possibly reach that conclusion here because, he says, SW's credibility was critical to the government's case—and her recantation would have impeached it.

But the trial record leaves a different impression. Willoughby overlooks not merely that the evidence against him was overwhelming, but that it was overwhelming specifically because it corroborated SW's testimony in so many ways. SW testified that Willoughby had intercourse with her daily, often on a tan pillow, and that on at least one occasion he forced her to use anal beads; the jury heard unrebutted expert testimony that DNA from Willoughby and SW was on both the pillow and the beads. SW testified that Willoughby directed her to cold-call potential johns, and that he gave her scripts of what to say; the jury saw the handwritten call logs and scripts as exhibits at trial. SW testified that she engaged in sex with "Chip" and "Ed" for money (which she then handed over to Willoughby); the jury heard each man say the same thing. SW testified that Willoughby drove her to Lagrange Street to look for johns; the jury heard another prostitute, Amber Higginbotham, testify that she saw Willoughby drop SW off there. SW testified that she called Willoughby for a ride home from a party store on Lagrange; the jury saw the store's phone records, which indeed showed a call to Willoughby's number during the time frame when SW said she was there. SW testified that Willoughby took her to a hotel during a swingers' convention to look for johns; the jury saw hotel receipts that showed Willoughby was at the hotel during the convention. And SW testified that Willoughby provided her with an array of paraphenalia—undergarments with specific patterns and colors, a notebook with Barbie stickers and johns' phone numbers inside, and a makeup bag containing baby oil, a condom, and wipes—all of which, the jury was later told, were seized during a search of Willoughby's home.

The corroborative force of this evidence—detailed, voluminous, and comprehensive—would have overwhelmed the modest impeachment value of any cross-

examination to the effect that SW had made and withdrawn an entirely unrelated allegation of consensual sexual conduct with a counselor. Beyond any reasonable doubt, the district court's decision to bar that cross-examination was harmless.

Willoughby also argues that the district court's decision to bar cross-examination about S.W's recantation violated his rights under the Confrontation Clause. We need not decide whether it did, because any such violation would be subject to the same harmless-error analysis—with the same outcome—as the analysis for the Rule 412 error. *See Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007). Finally, we agree with the government that the district court committed no error—and indeed took no action—with respect to SW's June 2009 interview with federal agents. That interview was not the subject of the government's motion under Rule 412, and thus was not affected by the district court's decision to grant the motion.

2.

Willoughby's most serious argument is that the district court mistakenly allowed the government to introduce evidence of his prior bad acts under Federal Rule of Evidence 404(b). Specifically, Willoughby argues that the court should have excluded testimony from Amber Higginbotham, who told the jury that Willoughby had been her pimp, and from Renee Todd, who told the jury that Willoughby had repeatedly asked her to prostitute for him.

We first consider our standard of review, since Willoughby never made this argument to the district court. He had ample opportunity to do so: in the government's pre-trial motion to admit the testimony of these witnesses, it gave notice that Higgenbotham would testify that Willoughby pimped her for three months, and that Todd would testify that Willoughby repeatedly sought to have her work as a prostitute for him (collectively, the "pimping testimony"). But Willoughby chose not to object to the pimping testimony. Instead, he objected to a different aspect of Todd's testimony—that Willoughby had given her drugs in exchange for sex—on grounds that it would "color the defendant as a drug dealer and poison the jury's opinion of him." We therefore review the district court's admission of the pimping testimony for plain error.

But the government contends we should not do even that, arguing that Willoughby waived, rather than forfeited, his objection to the admission of Todd's testimony in particular. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). The government says that Willoughby intentionally relinquished any objection to the pimping aspect of Todd's testimony when, near the end of the motion hearing, his counsel said that "I don't have as strong of [a] ground to argue" for the exclusion of this testimony and that "our primary concern" is that "drugs should be kept out." Whether these statements amount to waiver is a close question—one could hardly blame the district court for thinking that Willoughby had conceded the point—but for now we assume that Willoughby's objection to Todd's pimping testimony was merely forfeited.

To establish that the admission of the pimping testimony was plain error, Willoughby must show that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected [his] substantial rights . . . ; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alteration omitted).

We begin with the question whether the testimony's admission was error, and if so whether the error was obvious or clear. Rule 404(b) provides in relevant part:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The district court held that Higginbotham's pimping testimony was admissible for three purposes. The first was to show a "continuing pattern of illegal activity." The government does not defend that ground on appeal, and otherwise we do not see how it

supports admission of Higginbotham's testimony that Willoughby pimped her. A second purpose was to show that Willoughby "used a common plan or scheme to commit the charged crime." The government does not defend that ground either, and again we see no basis for it. Higginbotham did testify that Willoughby gave her condoms and counted them when she returned after work. But saying that a pimp counts condoms is like saying that a bank robber uses a gun. A methodology must be more distinctive than this to count as a "common plan" for purposes of the rule. *See United States v. Carney*, 387 F.3d 436, 452 (6th Cir. 2004).

A third purpose gains more traction: that Higginbotham's testimony was admissible to prove knowledge. To convict Willoughby, the government was required to prove that he recruited, enticed, harbored, or transported her knowing that she would be caused to engage in a commercial sex act. 18 U.S.C. § 1591(a). Higginbotham testified that, while she worked for Willoughby, she walked "the track" on Lagrange Street—a notorious location for prostitution in Toledo. That testimony was relevant to prove that Willoughby knew that Lagrange was a prostitution hub, which in turn is strong evidence that he knew that SW would be caused to engage in a commercial sex act when he left her there.

The same analysis holds as to Todd's testimony. She testified that Willoughby repeatedly asked her to prostitute for him while she walked the track at Lagrange. Thus, her testimony showed not only that Lagrange was a prostitution hub, but also that Willoughby knew it was.

Willoughby responds that his knowledge could not have been a proper purpose for the testimony's admission because he "did not raise his mental state as a defense." But neither did he concede the issue. Willoughby's knowledge was an element of the charged crime, not an affirmative defense; and that means the government was required to prove his knowledge—beyond a reasonable doubt, no less—regardless of whether Willoughby himself put it "in issue." *See United States v. Merriweather*, 78 F.3d 1070, 1076-78 (6th Cir. 1996). Of course, in some cases the nature of the proofs makes the existence of an elemental fact practically undisputed. *See, e.g.*, *United States v. Jenkins*,

593 F.3d 480, 485 (6th Cir. 2010) ("Whoever possessed all these drugs laying in plain view throughout the house obviously did not do so inadvertently"). But nothing made Willoughby's knowledge a foregone conclusion here. The government was thus entitled to admit evidence to prove that Willoughby knew that Lagrange was a track (and thus that he knew that SW would be caused to engage in a sex act when he left her there).

That a legitimate purpose supports the admission of bad-acts evidence, however, is not itself sufficient reason to admit it. Rather, the district court must also determine whether the evidence's probative value "is substantially outweighed by a danger of . . . unfair prejudice[,]" Fed. R. Evid. 403—a danger always to be taken seriously in cases where the prior crime and the charged crime are the same. Here, the record contains no indication that the district court conducted this balancing—a regrettable fact, though not necessarily a lethal one on plain-error review.

But there are good reasons to doubt that the balance tilts the government's way. To begin with the obvious: "When jurors hear that a defendant has on earlier occasions committed essentially the same crime as that for which he is on trial, the information unquestionably has a powerful and prejudicial impact." *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994). That is exactly what the jury heard here, when Higginbotham and Todd testified that Willoughby was a pimp. Moreover, "one factor in balancing unfair prejudice against probative value under Rule 403 is the availability of other means of proof." *Jenkins*, 593 F.3d at 485-86 (internal quotation marks omitted). Here, there were ample means—other than introduction of evidence that Willoughby was a pimp—to show that he knew Lagrange was a hub for prostitution. That Lagrange was a track, the proofs made clear, was common knowledge. Detective Peter Schwartz testified that Lagrange was a track. So did SW. So did Higginbotham and Todd—and without any reference to Willoughby. Thus, in light of the other evidence at trial, the probative value of the pimping testimony was modest: it merely showed that Willoughby knew what everyone else knew. Moreover—as demonstrated by the harmless-error analysis above—the government already had overwhelming proof that, when Willoughby drove SW to the residences of two johns, he knew full well that

she would be caused to engage in a commercial sex act there.  And that knowledge—or even the same knowledge as to just one of those johns—was enough convict him.  The government's use of the pimping testimony to show that he knew that Lagrange was a track, therefore, was "piling on."  *Jenkins*, 593 F.3d at 482.

The government's use of evidence with an unquestionably "powerful and prejudicial impact[,]" *Johnson*, 27 F.3d at 1193, merely to prove a fact already proven by overwhelming evidence, can be grounds for reversal.  But here our review is doubly deferential:  we must determine, in essence, that the district court obviously abused its discretion when it admitted the pimping testimony.  We cannot say that:  the testimony had a proper purpose, and on this record the government bore a significant burden in seeking to prove Willoughby's knowledge at trial.  Nor can we say that the admission of this testimony, as prejudicial as it was, affected Willoughby's substantial rights.  Even under ordinary review, the "admission of other-act evidence constitutes harmless error if the record evidence of guilt is overwhelming[.]"  *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013) (internal quotation marks omitted).  It was here.  The admission of the pimping testimony was not plain error.

3.

Willoughby's next argument concerns the testimony of Agent James Hardie, who testified twice during the trial.  Hardie first testified as a fact witness, for the most part reciting an inventory of items seized during the search of Willoughby's home.  During Hardie's second appearance, which came a day later, he initially gave some factual testimony about Willoughby's phone records and his interview with SW, but then gave expert testimony about the methods that pimps use to control their victims—some of which, Hardie said, Willoughby had used against SW.  Willoughby now argues that Hardie's testimony was improper because the jury was not instructed about the dual character (fact and expert) of Hardie's testimony.  *See generally United States v. Lopez–Medina*, 461 F.3d 724, 744-45 (6th Cir. 2006).

Willoughby did not make this argument to the district court.  At a pretrial hearing, his counsel did say that "[w]e also have an issue about whether [Agent Hardie]

can act as an expert witness and an evidence gatherer, and I believe that may be contrary to law." But to make an objection in the district court, counsel must do more than say that something "may be" contrary to law; rather, counsel must say that it *is*. Moreover, what Willoughby complains about now is not what he suggested then. What he suggested then was that Hardie could never testify as both a fact and expert witness—that doing so might be "contrary to law"—which would have been a meritless objection if made. *See id.* What Willoughby argues now is something different: that the jury was not properly instructed regarding the dual character of Hardie's testimony. Hence we review this argument only for plain error.

A witness may "testify as both a fact witness and an expert witness so long as there is either a cautionary jury instruction regarding the witness's dual roles or a clear demarcation between the witness's fact testimony and expert-opinion testimony." *United States v. Nixon*, 694 F.3d 623, 629 (6th Cir. 2012). Here, there were neither of those things, which—our court has already held—amounts to an error that is obvious or plain. *See Lopez-Medina*, 461 F.3d at 745.

But again Willoughby cannot show that the error affected his substantial rights. The potential problems with dual-character testimony are two-fold. First, absent a proper instruction, the jury might determine the witness's credibility in gross, so to speak, and thus think that his opinions—which in some cases might be relatively speculative—are just as reliable as his factual statements about, say, the items seized during a search. A proper instruction informs the jury that the witness has "testified to both facts and opinions[,]" and reminds them of the different ways to assign "proper weight" to each. Sixth Cir. Pattern Jury Instr. 7.03A. Second, absent a proper instruction, the jury might think that the witness's role as a fact witness somehow enhances his credibility as an expert, or vice-versa. *See generally Lopez-Medina*, 461 F.3d at 745.

But there is little reason to think that either of these problems were present here—because Hardie's testimony was largely uncontroversial. His factual testimony was almost ministerial in character: that the government's exhibit 8 at trial was a bra

seized from Willoughby's house, that exhibit 9 was a pair of panties likewise seized, that other exhibits depicted the content of Willoughby's phone records, and so on. Indeed, Hardie's factual testimony went unchallenged at trial—he was not even cross-examined about it—so there is every reason to think that the jury would have believed it just the same had they been properly instructed. The same is true for his expert testimony: that pimps manipulate their victims by posing as their boyfriends, by giving them gifts, and by beating them when they disobey; and that Willoughby did all of these things to manipulate SW. Again this testimony was not challenged on cross; and properly instructed or not, any sentient juror would have realized that Willoughby did these things not because he cared about SW, but to control her. The omission of a limiting instruction about Agent Hardie's dual roles did not affect Willoughby's substantial rights, and thus provides no ground to afford him relief.

4.

Willoughby argues that the cumulative effect of the district court's evidentiary errors deprived him of a fair trial. To obtain a new trial based on cumulative error, Willoughby must show that "the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). The only cognizable errors here were the district court's decision to exclude SW's prior false accusation under Rule 412 and its failure to instruct the jury as to Hardie's dual roles as a witness. For reasons already stated, even the combined effect of these errors was not nearly so great as to render Willoughby's trial fundamentally unfair.

5.

Willoughby argues that the district court should have conducted a reliability hearing under Federal Rule of Evidence 104 to determine whether SW could testify at trial. Rule 104(a) provides that the district court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." We review the court's refusal to conduct a hearing for an abuse of discretion. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 248-49 (6th Cir. 2001).

Willoughby contends that SW's youth, the officers' supposed predisposition to think that she was involved in prostitution, and her numerous interviews with law enforcement, all cast enough doubt on the reliability of her testimony as to require a Rule 104 hearing. The district court thought these concerns were merely grounds for cross-examination. Neither the record nor the Rule itself provide any reason to view that decision as an abuse of discretion.

## C.

Willoughby argues that we should reverse his conviction because, he says, the government lacked any proof that his sex trafficking occurred in or affected interstate or foreign commerce. *See* 18 U.S.C. § 1591(a)(1). We examine only whether any rational juror could have found this element met. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

"The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Here, the government's proofs included that Willoughby purchased condoms and clothes specifically for SW to use while prostituting, and that all of these items were manufactured out-of-state. The proofs also included that Willoughby used a Chinese-made cellphone in furtherance of his sex-trafficking activities. Moreover, Congress has specifically found that, in the aggregate, sex-trafficking activities "substantially affect[] interstate and foreign commerce." 22 U.S.C. § 7101(b)(12). Thus, considering the record as a whole, the government proved that Willoughby's activities were "in or affecting" interstate commerce. (We also note that Congress's authority to regulate interstate commerce includes the authority to regulate the instrumentalities thereof. *See United States v. Weathers*, 169 F.3d 336, 342 (6th Cir. 1999). Willoughby's cell phone is such an instrumentality, *id.*, and he used it in furtherance of his sex trafficking.)

## D.

Finally, Willoughby asserts that the district court made several errors at his sentencing.

1.

Willoughby argues that the district court's application of three different sentencing enhancements each amounted to impermissible double-counting. "[D]ouble counting occurs when precisely the same aspect of the defendant's conduct factors into his sentence in two separate ways." *United States v. Moon*, 513 F.3d 527, 542 (6th Cir. 2008) (internal quotation marks omitted).

Willoughby first challenges his enhancement under Sentencing Guideline § 2G1.3(b)(2)(B), which the district court applied on grounds that Willoughby had "unduly influenced" SW "to engage in prohibited sexual conduct." Willoughby says that his conviction under § 1591(b) already took this aspect of his conduct into account because this subsection includes, as an element, that the defendant used "force, . . . fraud, or coercion[.]" But the term "undue influence[,]" as used in § 2G1.3(b)(2)(B), is not limited to force, fraud, or coercion. Instead, it includes Willoughby's actions in manipulating SW and preying upon her status as a homeless, destitute runaway—which he did, for example, by posing as her boyfriend and buying her gifts. *See United States v. Smith*, 719 F.3d 1120, 1125 (9th Cir. 2013). That aspect of Willoughby's conduct was not already taken into account by the fact of his conviction; and thus the district court's application of this enhancement was proper.

Willoughby makes a similar argument about his enhancement under Guideline § 2G1.3(b)(4)(A). The district court applied that section because Willoughby's offense "involved the commission of a sex act[.]" U.S.S.G. § 2G1.3(b)(4). Willoughby argues that his § 1591(a) conviction already took this aspect of his conduct into account, because in his view the commission of a sex act was an element of his offense. But every circuit to have reached the issue disagrees with him. The relevant language in § 1591(a) requires that the defendant knowingly take certain actions—recruiting, transporting, or enticing, among others—knowing that the victim "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). And "[t]he future verb tense of

the phrase 'will be caused'—which precedes 'to engage in a commercial sex act'—indicates that a sex act does not have to occur to satisfy the elements of the child-sex-trafficking offense.  To conclude otherwise erases the meaning of 'will be' from the statutory text."  *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013).  Willoughby's offense was complete when he acted with the requisite knowledge—when he dropped SW off at Tusin's residence, for example—and not at the moment of penetration.  *Accord United States v. Jungers*, 702 F.3d 1066, 1073-74 (8th Cir. 2013); *United States v. Brooks*, 610 F.3d 1186, 1197 n.4 (9th Cir. 2010); *see also United States v. Tutstone*, 525 F. App'x 298, 304-05 (6th Cir. 2013).  His § 2G1.3(b)(4) enhancement was proper.

Willoughy also challenges his enhancement under Guideline § 3A1.1(b)(1), which the district court applied because SW was a vulnerable victim.  Again Willoughby argues that his conviction already takes this aspect of his conduct into account, because his crime by definition involved a minor, and all minors are vulnerable.  But the district court did not apply this enhancement simply because SW was a minor.  Instead, the court noted that SW was especially vulnerable for reasons other than her age—including that she was a homeless runaway with a history of abuse and neglect.  This enhancement was proper as well.

2.

Willoughby challenges his designation as a career offender under Guideline § 4B1.1.  Under that section, a defendant with two prior felony convictions for a "controlled substance offense" or a "crime of violence" becomes a career offender when convicted of another qualifying offense.  *See* U.S.S.G. § 4B1.1.  Willoughby admits that he has two qualifying convictions for drug offenses, so the only remaining question is whether his § 1591 offense is a crime of violence.

The guidelines define "crime of violence" to include any felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another" or "is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to

another." U.S.S.G. § 4B1.2(a). An offense qualifies as a crime of violence under the residual clause—i.e., as one that "otherwise involves conduct that presents a serious potential risk of physical injury to another"—if it "involved a potential risk of physical injury similar to that presented by burglary, extortion, arson, and crimes involving use of explosives." *Sykes v. United States*, 131 S. Ct. 2267, 2277 (2011). Thus, as a general matter, "levels of risk divide crimes that qualify [as crimes of violence] from those that do not." *Id.* at 2275.

In determining whether § 1591 is a crime of violence, we begin by using a "categorical approach," which looks only to the fact of conviction and the statutory definition—not to the facts underlying the offense. *See United States v. Johnson*, 675 F.3d 1013, 1016 (6th Cir. 2012). Willoughby was convicted of violating § 1591(a) and (b); and thus his offense, boiled down to its statutory definition, was the use of force, threats of force, fraud, or coercion, knowing that these actions would cause a minor (SW) to engage in a commercial sex act. Willoughby points out that, so defined, his offense does not necessarily involve his own use of force against SW; he could have used fraud instead. But the act of causing a minor to engage in prostitution—even when the defendant's act does itself not involve force—obviously does present a "serious potential risk of physical injury" to the victim. U.S.S.G. § 4B1.2(a)(2). There is the risk of physical injury from the sex act itself; the risk of violence from johns, many of whom (like "Pistol" in this case) are addicted to drugs; and, not least, the risk of violence from the pimps themselves. The latter risk is present regardless of whether the pimp uses force to cause his victim to engage in a sex act; because there is always a serious risk that he will use force afterward, if she disobeys his rules, fails to obtain a client, or for any number of reasons. *Cf. United States v. Williams*, 529 F.3d 1, 5-6 (1st Cir. 2008) ("It seems self-evident to us that a prostituted child . . . faces more and greater risks than does a seduced child, including the dual risk of physical abuse by either her pimp or her client"); *United States v. Patterson*, 576 F.3d 431, 442 (7th Cir. 2009) ("[I]t is 'surpassingly difficult to see how burglary could be treated as a violent crime yet child [sex] trafficking exempted'").

Willoughby makes an oblique but thoughtful argument in response. He points out that 18 U.S.C. § 3142—entitled "Release or detention of a defendant pending trial"—requires the district court to hold a detention hearing upon the government's motion in any case that involves "a crime of violence, a violation of § 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed[.]" 18 U.S.C. § 3142(f)(1)(A). And Willoughly contends that the reference to § 1591 in this subsection would be unnecessary—and thus would be surplusage—if a violation of § 1591 is categorically a crime of violence.

The problem with this argument is that the definition of "crime of violence" as used in § 3142 is different from the definition in § 4B1.2(a)(2). Specifically, the definition of "crime of violence," as used in § 3142, does not include anything like the residual clause of § 4B1.2(a)(2). *See* 18 U.S.C. § 3156(a)(4). And the residual clause is what gives § 4B1.2 much of its breadth. That a violation of § 1591 is a crime of violence under the residual clause of § 4B1.2(a)(2), therefore, does not necessarily mean that it is a crime of violence as defined by § 3156(a)(4). Thus, the reference to § 1591 in § 3142 is not surplusage.

3.

Willoughby argues that his sentence was substantively unreasonable. We review the reasonableness of his sentence for an abuse of discretion, "tak[ing] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). Here, the district court imposed a sentence within Willoughby's guidelines range, which means his sentence was presumptively reasonable. *United States v. Wilms*, 495 F.3d 277, 280 (6th Cir. 2007). Suffice it to say that he has not rebutted the presumption.

\*     \*     \*

The district court's judgment is affirmed.