NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0423n.06

No. 13-1322

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jun 11, 2014 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| STEVEN WILLIAM DEUMAN, JR., | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: NORRIS, CLAY, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. The facts of this case are unavoidably disturbing. A jury convicted Steven Deuman of sexually assaulting his 15-week-old daughter in violation of 18 U.S.C. § 2241(c), and thereby murdering her by asphyxiation in violation of 18 U.S.C. § 1111(a). Deuman now challenges his convictions on numerous grounds. We reject all of his arguments and affirm.

I.

A.

Deuman and Natasha Maitland had two children: a two-year-old son, S.D., and 15-week-old daughter, E.D. They lived in a trailer with Deuman's brother, Silvano Southbird, and Southbird's family. Deuman and Southbird were members of the Grand Traverse Band of Ottawa and Chippewa Indians. Southbird owned the trailer, which was located within Indian

country in Sutton's Bay, Michigan. Ten people lived in the trailer; Deuman, Maitland, and their two children shared one room.

On the night of August 11, 2011, Maitland and Deuman had sex using a condom. Afterwards, Deuman tied the used condom in a knot and tossed it on the floor beside the bed. The next morning, Maitland woke up early for work and cleaned the room. She picked up the used condom, its wrapper, and a soiled diaper off the floor, and threw them away in the kitchen trash can. Maitland then placed a box of condoms on the nightstand next to the bed. She did not shower that morning because the water heater was broken.

Deuman was unemployed and stayed home to care for E.D. He knew that Maitland was scheduled to work until 7:00 p.m. that evening. At 6:49 p.m., Deuman sent Maitland the first of two text messages; both messages asked Maitland where she was. Deuman called Maitland at 7:05 p.m., and told her to call him back after she picked up her paycheck from her second job. Maitland did so at 7:35 p.m., and told Deuman to meet her at the tribal gas station so that she could pay to fill his motorcycle with gas. Deuman told Maitland to call back again when she neared the gas station, which was a five-to-ten-minute drive from the trailer. Deuman then went outside to smoke a cigarette with Southbird and his wife, Veronica Reynaga.

Maitland called back at 7:45 p.m. Deuman answered while smoking outside the trailer. He asked Southbird and Reynaga to watch E.D. while he went to meet Maitland at the gas station. Before he left, Deuman told Southbird and Reynaga that he was going to check on E.D. (something he normally did not do). Deuman went into the trailer, quickly returned, and said that something was wrong with E.D. Deuman led Southbird to the bedroom, where E.D. lay on the bed, motionless. Deuman explained that earlier he had left E.D. in the middle of the bed with a bottle, surrounded by blankets and pillows; and that when he walked into the room just

then, he found E.D. on the floor, by the foot of the bed. Southbird told Deuman that they needed to take E.D. to the hospital, immediately.

At 7:47 p.m., Deuman called Maitland and said "get home now; get home now." As Maitland arrived home three minutes later, she saw Southbird's car pulling out of the driveway, headed towards Traverse City. Maitland pulled up to the trailer. Deuman exited Southbird's car with E.D's lifeless body in his hands. Maitland checked for a pulse, but found none. E.D. was blue, cold to the touch, and had a line of blood running from her mouth to her forehead.

Maitland called 911 immediately after learning that neither Deuman or Southbird had done so. Deuman grabbed the phone from Maitland and yelled at the dispatcher: "[E.D.] was sleeping on the bed, I laid her on the bed to sleep, she's not at the point of rolling over, she's three months old, I went to check on her, we were outside maybe ten minutes. And I go in and she is unconscious."

Maitland told Reynaga to drive her and E.D. to the hospital. As they drove there, the 911 dispatcher told Maitland to pull to the side of the road and wait for an ambulance. Reynaga pulled over and Maitland gave CPR to E.D. on the side of the road. A paramedic arrived and also attempted CPR. An EMT then arrived and directed that E.D. be put into the ambulance. The EMT then inserted a breathing tube into E.D.'s throat. He observed that E.D.'s airway appeared deformed: instead of having a normal V-shape like the other infants he had treated during his 24-year career, E.D.'s throat tissues had been pushed away, widening her throat to more of a U-shape. The paramedics drove E.D. to the hospital.

Meanwhile, Deuman had stayed at the trailer. He called out: "Oh, God, please don't let this happen to me." Southbird told his brother that he should have gone to the hospital with E.D., and gave Deuman $16 to fuel his motorcycle. Deuman went to the gas station and filled

his gas tank. Then he went inside the gas station and filled out a tribal-discount form, which saved him 76 cents.

When Deuman arrived to the hospital, he yelled at the paramedics, "[y]ou killed my fucking mom and now you killed my baby, too." An emergency room doctor asked Deuman to explain what happened to E.D. Deuman responded that he had gone back into the bedroom after a smoke "and the baby was on the floor with blood around its nose."

At 8:50 p.m., a doctor pronounced E.D. dead. Soon after, the hospital allowed Maitland and Deuman to see E.D.'s body in the trauma room. As they sat alone with their dead baby, Deuman whispered to Maitland that he had found a condom in E.D.'s mouth. He had not told this fact to Southbird, the 911 dispatcher, or the paramedics and doctors.

The next day, Dr. David Start performed an autopsy on E.D.'s body. He concluded that the cause of E.D.'s death was asphyxiation from a foreign object blocking her airway. Start found no evidence that E.D. had fallen from the bed; and he determined that it was "not a reasonable possibility" that the three-month-old E.D. could have grasped a condom, placed it in her mouth, and sucked it in far enough to block her airway. Start concluded that E.D.'s death was a homicide. He further determined that E.D.'s death was consistent with an adult penis having been put in her mouth and blocking her airway, and that the oral penetration would not necessarily have resulted in physical trauma to E.D.'s mouth.

Twenty-eight hours after E.D.'s death, the FBI searched the trailer. On the bedroom floor, the FBI found a used condom beneath a dirty diaper and several condom wrappers. The box of condoms was on the bed. A forensic scientist discovered a sizeable blood stain on the carpet next to the head of the bed, which later proved to be a mixture of bloody fluid from E.D.'s lungs.

Later that day, FBI agents Robert Birdsong and Larry Stewart interviewed Deuman. He told them that E.D. had been healthy the day that she died. Deuman also said that E.D. was unable to hold a bottle by herself or grasp an item unless it was put in front of her. According to Deuman, he put E.D. in the center of the bed with a bottle, and surrounded her with blankets and pillows so that she could not roll off. Then he went outside to smoke a cigarette. Two-to-seven minutes later he heard E.D. cry. He got a "bad feeling," and went to check on her. He found E.D. lying face down on the floor by the head of the bed. He picked her up and found an unrolled condom in her mouth and blood on her lips. At that point, Agent Birdsong asked Deuman how E.D. could have ended up on the floor with a condom in her mouth. Deuman responded: "if you're accusing me of sticking my dick in her mouth, then you're a sick mother-fucker." At that point, no one had yet suggested to Deuman that he had done anything of the sort.

On August 16th, Birdsong met with Maitland and Deuman. Birdsong told them that E.D. died of asphyxiation. Deuman then asked whether there was any damage to E.D.'s mouth. Birdsong responded that there was none. Deuman placed his head in his hands, and exclaimed, "[t]hank God." Deuman also asked whether any fluids had been found in E.D.'s mouth. Birdsong responded that they were still awaiting the test results.

Later that evening, Deuman and Maitland visited Deuman's aunt, a member of the Grand Traverse Tribe. Deuman told his aunt that E.D. had rolled off the bed and that Deuman had found her unconscious. His aunt said that Deuman's story did not make sense, and that perhaps E.D.'s death could be explained by "bear walking"—*i.e.*, there were good families and bad families, and the bad families were bear walkers, who could shape-shift into bears. Bear walkers could also take a person's DNA and become that person.

The next day, Agents Birdsong and Fred Berry, and Detective Richard Campos (Tribal Police) drove Deuman to Flint for a polygraph examination. During the drive, Deuman told the agents that E.D. had communicated to him when he saw her body at the funeral home. E.D. supposedly said that everyone should leave the trailer because it was haunted by evil spirits. On the drive home after the polygraph, Deuman said that he thought it was possible that he had killed E.D. while being bear-walked by one of the evil spirits. Deuman also said that there was a "50 percent" chance that he would be able to tell them what actually happened to E.D., an estimate he revised to "70 percent," and ultimately to "80 percent." But first he wanted to talk to Maitland. The agents dropped Deuman off at the hotel where he and Maitland were staying.

Deuman took Maitland out to the hotel's golf course for a talk. He told her that he might have blacked out the day that E.D. died, and that he thought that he had been bear-walked.

A forensic analyst tested the used condom found on the bedroom floor. On the outside of the condom she found DNA only from E.D. On the inside was DNA from both Maitland and Deuman. A forensic expert later explained that Maitland's DNA could have been transferred to Deuman's penis when the two had sex the night before.

The FBI arrested Deuman on August 18th.

## B.

A grand jury indicted Deuman, charging him with the murder of his 15-week-old daughter by aggravated sexual abuse. After an eight-day trial, a jury convicted Deuman of aggravated sexual abuse in violation of 18 U.S.C. § 2241(c), and first-degree murder in violation of 18 U.S.C. § 1111(a). The district court sentenced Deuman to life imprisonment on each conviction. This appeal followed.

II.

A.

Deuman first challenges the sufficiency of the evidence supporting each of his convictions. Specifically, Deuman contends that there was evidence that E.D. had been accidentally asphyxiated, but no evidence that he had sexually assaulted E.D. or caused her death. Our only task is to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Circumstantial evidence alone can sustain a guilty verdict. *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009).

The evidence of Deuman's guilt was nearly overwhelming here. Deuman was E.D.'s sole caretaker at the time of her death. She could not grasp objects on her own. She was incapable of rolling over; and she was certainly incapable of crawling over the barrier of blankets and pillows that Deuman supposedly had built up around her. There was also no physical evidence that E.D. had fallen off the bed. Maitland testified that she threw away the previous night's used condom and the condom's wrapper, and had placed the box of condoms on the nightstand. But FBI agents found a used condom on the bedroom floor beneath a dirty diaper, condom wrappers, and the box of condoms on the bed, suggesting that all of these items had been moved from where Maitland had put them. Forensic analysis established that the used condom found in the bedroom had been in E.D.'s mouth and on Deuman's penis. None of E.D.'s DNA was on the inside of the condom and none of Maitland's was on the outside. Dr. Start testified that E.D.'s death was consistent with an adult penis having been put in her mouth, blocking her airway, and asphyxiating her. Start also rejected the theory that E.D. could have

rolled off the bed, picked up a condom, and swallowed it. Dr. Debra Simms, a board-certified child-abuse pediatrician, testified that, in most cases of penile-oral contact between adults and children—including infants as young as six days old—there is no physical trauma found in the victim's mouth. Simms also opined—just as Start did—that an adult penis was capable of blocking an infant's airway, causing asphyxiation.

To all that, add Deuman's complete lack of credibility. Deuman repeatedly told investigators and family members that he had put E.D. on the bed to feed her a bottle. But the autopsy revealed that she had no formula in her stomach. He said that he had warmed the bottle by running it under warm water from the kitchen's faucet. But the trailer's water heater was broken. He told Southbird, moments after he found E.D. unconscious, that E.D. had been face down at the foot of the bed. But the pool of blood from E.D.'s lungs was found on the floor next to the head of the bed. And he held E.D.'s breathless, cold, blue body, and saw the blood running from her mouth without even calling 911.

The government also presented propensity evidence that supported the jury's finding that Deuman had sexually abused and killed E.D. When Deuman was 14, he babysat six-year-old S.M.P. and her five-year-old brother, C.J.P. S.M.P. testified that Deuman forced the two young children to watch a pornographic movie and then reenact the sex acts they had just watched. S.M.P. also testified that Deuman twice forced her to perform oral sex on him; the second time, Deuman thrust his penis so far into her throat that she gagged. Deuman's own mother testified that Deuman had admitted to sexually assaulting S.M.P. and C.J.P. during an inpatient sex-offender treatment program. When Deuman was 18, he had a sexual relationship with A.K.P. when she was 11 or 12 years old. A.K.P. testified that sex and oral sex were very

important to Deuman, and that he would verbally abuse her when she declined to have sex with him.

From all of this evidence, a rational jury could have easily found that Deuman choked E.D. to death by putting his penis in her mouth.

Deuman responds with a theory of E.D.'s accidental death based on selective trial evidence and implausible conjecture. He asserts that "[Lucky] [t]he dog had a habit of removing items from the household garbage, including the used condoms, [and strewing them] throughout the residence," that E.D. rolled off the bed (notwithstanding the barrier of blankets around her and E.D. never before having rolled over), and that she accidentally swallowed a used condom left on the carpet by the dog (despite E.D. being unable to pick up the condom). Suffice it to say that the jury could have rejected this story.

B.

Deuman also challenges four of the district court's evidentiary decisions. We review these decisions for an abuse of discretion. *United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004).

1.

Deuman argues that the district court abused its discretion by admitting S.M.P's and A.K.P's testimony about his past sexual assault and child molestation. The district court admitted S.M.P.'s and A.K.P.'s testimony under Federal Rules of Evidence 414. (The court also admitted their testimony under Rule 413, but we need not address that alternative basis.) Rule 414 states, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation." The court found that Deuman's prior molestation and sexual assault of S.M.P. and A.K.P. were admissible under

Rule 414, and then admitted the evidence after balancing its probative value and prejudicial effect pursuant to Federal Rule of Evidence 403.

Deuman does not contest the district court's determination that each woman's testimony was admissible under Federal Rules of Evidence 414.  Nor could he:  Rule 414 defines a "child" as a person below the age of 14, and "child molestation" as a crime under federal law or under state law, involving, among other things, "contact between the defendant's genitals or anus and any part of a child's body."  Fed. R. Evid. 414(d).  Deuman's oral rape of S.M.P. when she was six years old meets that definition.  The same is true for Deuman's rape of A.K.P. when she was 11 or 12 years old.

Instead, Deuman argues that the district court abused its discretion in two ways.  First, he contends that S.M.P.'s and A.K.P.'s testimony was irrelevant under Rule 401.  The standard for relevancy is extremely liberal:  evidence is relevant "if it has any tendency to make a fact more or less probable than it would be without the evidence**."**  Fed. R. Evid. 401.  Rule 414 itself was a "strong legislative judgment that evidence of prior sexual offenses" have probative value and "should ordinarily be admissible."  *United States v. Gabe*, 237 F.3d 954, 959 (8th Cir. 2001) (internal quotation omitted).  We have no reason to depart from that judgment here:  that Deuman raped two other children tends to make it more likely that he raped E.D.

Second, Deuman contends that the district court abused its discretion when it applied the Rule 403 balancing test.  We review the district court's Rule 403 ruling to admit certain evidence for an abuse of discretion, "maximiz[ing] the probative value of the evidence and minimiz[ing] its potential prejudice to the defendant[s]."  *United States v. Bartholomew*, 310 F.3d 912, 921 (6th Cir. 2002).

In this case, Deuman was accused of forcing oral sex on his 15-week-old daughter while he babysat her. The evidence of Deuman's prior child molestations was highly probative because they included similar acts under similar circumstances. Deuman repeatedly molested six-year-old S.M.P. and five-year-old C.J.P. when he babysat them. He also forced oral sex on S.M.P. on two different occasions. Deuman's statutory rape of 11-or-12-year-old A.K.P. also included oral sex.

Deuman is correct that S.M.P.'s and A.K.P.'s testimony was highly prejudicial. But much of that prejudice was fair. *See* Fed. R. Evid. 403. The district court did not abuse its discretion. And for the same reasons, *a fortiori*, the admission of this evidence did not deprive Deuman of his right to a fair trial.

2.

Deuman next argues that the district court wrongly applied Federal Rule of Evidence 412 to prevent him from cross-examining S.M.P and A.K.P. about their past sexual conduct with other men. Rule 412 prohibits "evidence offered to prove that a victim engaged in other sexual behavior." The court disallowed cross-examination about the witnesses' past sexual conduct in part because Deuman had failed to comply with Rule 412's notice requirement. Fed. R. Evid. 412(c).

Before us, Deuman contends S.M.P. and A.K.P. are not "victims" under Rule 412 because they were not the victims in this case. But Rule 412 defines "victim" to include "an alleged victim." *Id*. That definition uses the indefinite article "an" as opposed to the definite article "the." By its terms, then, the rule applies to *any* witness who has been a victim of sexual assault, not just a witness who was the specific victim of the pending case. Moreover, Rule 412's Advisory Committee Notes state that the rule "extends to 'pattern' witnesses in both

criminal and civil cases whose testimony about other instances of sexual misconduct by the person accused is otherwise admissible." Thus, Deuman's argument that Rule 412 did not apply to S.M.P. and A.K.P. is meritless.

3.

Deuman also argues that the district court abused its discretion by admitting four photographs of E.D.—two of which showed her healthy and alive, and two of which showed her in the hospital soon after she died. The post-mortem photos of E.D. showed some blood coming out of E.D.'s nose and the breathing tube that had been installed by the EMT. Deuman contends that these photos had minimal probative value, but were highly prejudicial because they "arouse[d] the emotions of the jury[.]"

We consider the pre- and post-mortem photos separately. The pre-mortem photos were relevant because E.D.'s appearance in them tended to disprove Deuman's defense that she would have been capable of surmounting the barrier on the bed and picking up a condom and putting it in her mouth. These photos were also minimally prejudicial.

The post-mortem photographs are more problematic. The government says these photographs were relevant as background to show the manner in which E.D. had been intubated. But we do not see how that fact—the manner in which E.D. had been intubated—tended to make more or less likely any material fact in this case. Meanwhile, the photographs were prejudicial, though not terribly so. We therefore have our doubts about the district court's determination that the post-mortem photographs passed muster under Rule 403. But in any event the admission of these photos was harmless, given the nearly overwhelming strength of the government's case. *See United States v. Willoughby*, 742 F.3d 229, 235 (6th Cir. 2014).

4.

Finally, Deuman argues that the district court mistakenly allowed the government to introduce evidence of his prior bad acts under Federal Rule of Evidence 404(b). Specifically, Deuman contends that the court should have excluded Maitland's testimony that Deuman became overstimulated during oral sex, and sometimes grabbed Maitland's head and thrust his penis far enough into her throat to make her gag. Deuman objected to that evidence at trial. The district court admitted the evidence without stating whether the testimony constituted "other act[]" evidence under 404(b); but the court did say that, "[j]ust for the record, the relevance [of the testimony] is not substantially outweighed by any prejudice in this particular situation."

Rule 404(b) prohibits evidence of "other act[s] . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." That was arguably the basis upon which this testimony came in here: for even under the government's reasoning, Maitland's testimony was offered to show that Deuman had a propensity to get carried away during oral sex, which explained how he could have killed E.D. while sexually abusing her.

But the admission of this testimony likewise was harmless. Evidence is harmless if 'it appears beyond a reasonable doubt' that the error made no difference to the verdict." *Willoughby*, 742 F.3d at 235 (quoting *United States v. Freeman,* 730 F.3d 590, 595 (6th Cir.2013). And here, Maitland's testimony that Deuman sometimes gagged her during oral sex was repetitive of S.M.P.'s far more damaging—and properly admitted—testimony that Deuman did the same thing to her when she was only six years old. Thus, we are confident beyond a reasonable doubt that Maitland's testimony on this point had no effect on the verdict.

\*     \*     \*

The district court's judgment is affirmed.